Margaret TREADWELL,
Plaintiff-Appellant,

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant-Appellee.

No. 564, Docket 82–6124.

United States Court of Appeals, Second Circuit.

Submitted Dec. 13, 1982.

Decided Jan. 11, 1983.

Farmworker Legal Services of New York, Inc., Newburgh, N.Y. (Howard Schell Reilly, Thomas A. Harnett, Newburgh, N.Y., of counsel), for plaintiff-appellant.

John S. Martin, Jr., U.S. Atty., S.D.N.Y. (J.D. Pope, Peter C. Salerno, Asst. U.S. Attys., New York City, of counsel), for defendant-appellee.

Before KAUFMAN, TIMBERS and CARDAMONE, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The case before us presents a somewhat ironic situation. The failure to employ available procedures, and the resulting non-enforcement of administrative subpoenas, appears to have stemmed not from absence of sympathy to the claimant's position, but from a lack of understanding how to proceed. As the facts indicate, the error of omission led to other procedural infirmities, and ultimately to a deprivation of due process. Accordingly, we reverse and remand. 535 F.Supp. 643.

## I

We set out in some detail the intricate procedural and factual matrix which generated this appeal.

Margaret Treadwell, an illiterate migrant farmworker representing herself, first applied for disability insurance benefits in December, 1973. On February 22, 1974, her application was denied, the Director of HEW's Division of Initial Claims having determined Treadwell had not demonstrated "insured status," pursuant to the Social Security Act, 42 U.S.C. § 423(c)(1)(B)(i). That provision requires a claimant to establish he or she earned twenty calendar "quarters of coverage" during the forty quarter period ending with the quarter in which the disability is alleged to have arisen.[1] Because the Administration's official earnings record evidenced credit for only twelve quarters of coverage during the relevant period, Treadwell had not proved her eligibility for benefits. *See id.* § 405(c)(4)(B) (absence of entry in Secretary's records as to wages alleged to have been paid considered presumptive evidence of nonpayment).

In response to this initial denial, Treadwell submitted statements to supplement her earnings record and to show she had been employed for a sufficient number of quarters to qualify for disability insurance. She named various employers, in New York and Florida, for whom she claimed to have worked, and who might have failed to report her earnings to the Social Security Administration. Treating her statements as an implied request for reconsideration, the Administration attempted to communicate with the employers she had named. Of those who replied—and several never did— the majority failed to substantiate Treadwell's claim of employment. In February,

1977, on reconsideration, the claim was again denied.

In December, 1977, Treadwell, now represented by counsel, was granted a hearing before an Administrative Law Judge. On May 3, 1978, two weeks before the hearing, Treadwell's attorney requested the issuance of administrative subpoenas. Noting that although his client would testify at the hearing, she "can neither read nor write and has no written records from the years in question," counsel asked the ALJ to subpoena eight employers and their payroll and tax records, *see* 42 U.S.C. § 405(d). The ALJ issued subpoenas requiring production of the documents, but not compelling the employers' appearance at the hearing.[2]

By the time of the hearing, only two of the eight subpoenaed employers had responded. Daniel Kaduk, a Newburgh, New York resident for whom Treadwell claimed to have performed domestic work, wrote:

> Margaret Treadwell, to the best of our recollection, only worked a few days in March and April of 1973 as a domestic. It was never reported because she didn't earn enough to report.

Joseph Rapisardi, owner of a farm in the Newburgh area, did not respond directly. Rather, his son-in-law, Benjamin Gilberti, after indicating Rapisardi was in Europe and would remain unavailable for some months, stated that the farm had been sold more than five years previously, and "[a]s for the records, they were all destroyed in a fire . . . ." Gilberti went on to say that Treadwell had "never been in Mr. Rapisardi's regular employment," although she may have "worked a few days" in place of her daughter, during the latter's illness. No details were given—if, indeed, Gilberti knew them—of the daughter's indisposition or the time of its occurrence, nor did Gilber-

1. Calendar quarters are the three-month periods ending on March 31, June 30, September 30, and December 31. 42 U.S.C. § 413(a)(1). Generally, a quarter of coverage is earned for any such period in which the claimant is paid $50 or more in wages. *Id.* § 413(a)(2). In the case of agricultural labor, a quarter of coverage is established for each $100 of wages paid by an employer at any time during a calendar

year. *See id.* § 413(a)(2)(iv). For agricultural labor, the maximum number of quarters that can be earned in a year is four. *Id.*

2. The subpoenas contain what appears to be boilerplate language, requiring the subpoena itself be brought to the hearing, but the language compelling the party's attendance was excised.

ti state the wages Treadwell "may have" earned. Gilberti ended his letter by gratuitously expressing his belief that Treadwell "was perpetrating a fraud" by "claiming disability," a somewhat puzzling assertion since Gilberti does not appear to have possessed any knowledge of the nature of Treadwell's claim.

Of the remaining subpoenaed employers, four were in Florida. At the hearing, after stating he did not expect them to come to New York to testify, the ALJ suggested the administrative record be kept open, and the Floridians be given an opportunity to respond to written questions submitted by Treadwell. Treadwell's attorney acceded to this procedure.[3] Regarding the New York employers who had not answered the subpoenas, Noreco Fruit Packing Co. and Marlboro Freezers, counsel registered his request that they be compelled to do so, and noted that despite the specificity of the subpoenas, "[some of] the local people who are just a few miles away . . . say, 'Never worked for me.' Period." Obviously sympathetic to Treadwell's complaint that the employers' failure to comply with the terms of the subpoenas prejudiced her ability effectively to "confront" them, the ALJ suggested counsel conduct his own investigation. The ALJ did not, however, indicate a readiness to enforce the subpoenas because he was laboring under the belief that the exclusive authority to do so was lodged with the United States Attorney.

Oral testimony taken at the hearing further entangled an already snarled evidentiary web. Treadwell had claimed, via her attorney's introductory remarks, that she would establish the requisite quarters of coverage based upon, *inter alia,* domestic work for Kaduk and a second employer, one "Gilverte." As it developed, however, she did not testify concerning work performed for Kaduk. She did claim to have worked for Gilverte, although she did not testify to the amount earned. As noted, one Gilberti wrote a letter in response to the subpoena issued to the Rapisardi farm, admitting Treadwell had perhaps been briefly employed there, although denying she had ever been in the regular employ of the farm. Whether Gilverte is Gilberti, and whether Treadwell was claiming to have taken on domestic chores for Mrs. Gilberti about the time she was also employed by the farm, or whether the similarity in names is purely fortuitous, and therefore irrelevant, are issues as cloudy as virtually every other detail in this case.

Treadwell also testified concerning agricultural labor. She claimed to have been employed intermittently over a period of approximately fourteen years by Troncillito's farm in New York. Although initially uncertain of the specific years she performed this seasonal work, Treadwell eventually estimated the fourteen-year period ran from 1958 to 1972. She also testified to having worked for several Florida employers. Three were itinerant "crew leaders," in charge of groups of migrant workers, and treated as employers for social security purposes when they pay the worker directly, 20 C.F.R. § 404.1010 (1982). The other was a Donald Manke, for whom Treadwell said she had done domestic work.[4]

---

**3.** We do not read the hearing transcript as supporting the Government's claim that Treadwell's counsel regarded the question and answer procedure as a full and appropriate substitute for the production of tax and payroll records. Counsel indicated he had been informed by the United States Attorney's office that it was too soon to expect responses from the Floridians. The ALJ, after remarking that the case before him was an "old" one, and noting Congressional "pressure" to dispose of disability claims promptly, seems to have suggested the submission of written questions as a compromise. Treadwell's attorney never abandoned his basic point, however, that Treadwell should be afforded an opportunity to confront, in some fashion, allegations of ex-employers adverse to her claim. For example, he expressed a desire to be present, when the Floridians were questioned, to be able to cross-examine them. That he settled for written responses upon the prodding of the ALJ at this stage of the proceedings, does not signify a retreat from his position, which he reiterated on several occasions, that a record containing unchallenged answers by employers was an incomplete one. *See* note 7 *infra.*

**4.** Two other Florida ex-employers were named by Treadwell. Counsel later discovered the work done for one, Mrs. Jacqueline Boyce, had

All four were subjected to the written question and answer procedure previously suggested by the ALJ. Of the three crew leaders, one (Willie Bonds) claimed never to have employed Treadwell, one (Clarence Barnett) could not be reached, and one (Otis Wilson) reported that Treadwell had worked for him on a part-time basis and that her work was credited variously to her husband, son-in-law, or granddaughter, but claimed not to recall either the years Treadwell had worked or the rate of pay for work she had done. Wilson did state Treadwell worked as many as five eight-hour days in several different years. Apparently unaware of any irony implicit in the remark, Wilson stated: "No records on Margaret Treadwell at all. I am willing to let [the Social Security Administration] look at my records for these years, but I no longer have them." [5]

Manke, proprietor of the Indian Lake Motel, stated in a telephone conversation with a Social Security Administration representative that Treadwell had worked for him no more than four days and had earned less than thirty dollars. In direct contradiction, the official Administration "Itemized Statement of Earnings" reflected payment to Treadwell by the hotel of over five hundred dollars. [6]

Lina Mae Hillard, Treadwell's daughter, testified that she and her mother had worked at Troncillito's. Hillard also corroborated her mother's claim of employment by Noreco, Marlboro Freezers, "Gilverte," Kaduk, and the Floridians. Finally, Treadwell's husband stated that from the beginning of the relevant period until 1972 he and his wife picked crops seasonally at Troncillito's, except when she performed domestic work. He also testified to their employment together on various farms in Florida, but did not specify either the years they were so employed, or the wages Mrs. Treadwell received. [7]

occurred before the relevant period, and his request to have Mrs. Boyce brought to New York for cross-examination was withdrawn. The other was a Mrs. Ladd. After the hearing, Treadwell informed her attorney that an incorrect address had resulted in the wrong Mrs. Ladd being contacted. Counsel asked that this mistake be rectified by submission of the questions to the appropriate Mrs. Ladd. The record does not reveal whether this request was complied with.

5. Apparently, Wilson meant to indicate that although he had disposed of his Social Security records when the farms themselves began withholding social security taxes, rather than having crew leaders do it, he would authorize the Internal Revenue Service to make his tax records available to the Administration. In any event, Treadwell's counsel's best efforts to trace Wilson's records proved unsuccessful. The IRS instructed him to communicate with the local Social Security Administration office in Florida, stating, "If Social Security does not have [Wilson's] records [of Treadwell's employment], please have ... Wilson send in a written request for this information." It is unclear how a second request, under a different signature, would have succeeded where the first had failed.

6. Similarly, Mrs. Boyce, whose role in Treadwell's work history ultimately became irrelevant, see note 4 supra, first told the Administration that Treadwell had been in her employ, but when contacted a second time, denied ever having heard of her.

7. The Government asserts that Mr. Treadwell first testified that when he and his wife worked together only he received a check, which covered both his and his wife's work, but later contradicted himself by stating they were compensated separately. A careful reading of the hearing transcript reveals, however, that he was testifying to two procedures, the single paycheck method apparently utilized in New York, and the separate payment method which may have been used in Florida. In any event, Mr. Treadwell also stated he was uncertain which of the two approaches was taken. The salient point, as Treadwell's counsel repeatedly emphasized, is that although

there may have been a situation ... where piece rate [agricultural] work was done and where it was only credited to the husband's account[,] ... it also [may] have been that checks were paid and if so, there should be payroll records.

Now, all these employers were served with subpoenas and they were requested to produce payroll and tax records.

Now, a couple of them called me on the phone and asked about this. None of them produced payroll or tax records. If they have a record in their journal or in their account book, it shows the list of employees and the amount they worked each week and if, for instance, the Tronsolitos [sic] [records] won't say that only the husband worked and not the wife, a Xerox of that page would show that very quickly. But I'm not willing just to take a summary or conclusion that she never

After the hearing, Marlboro Freezers sent a detailed report, on the basis of which Treadwell was credited with two additional quarters of coverage, bringing her total to fourteen. Additionally, Treadwell's counsel requested enforcement of the subpoenas issued to Kaduk and Troncillito's.[8] Although, as we have indicated, Kaduk had written the ALJ that no records or reportable earnings existed for Treadwell, counsel claimed that Kaduk and Treadwell had recently met accidentally, at which time Kaduk allegedly confirmed she had worked as a domestic for him and his wife and had cared for their son. Treadwell's attorney argued that if proved, this claim would add two quarters of coverage to her earnings record. Regarding Troncillito's, the attorney wrote:

> In the file currently is a telephone conversation between Social Security representative Linda Hansen and Joan Troncillito on May 22, 1975, in which Joan Troncillito denied Margaret ever worked for Troncillitos but confirming that her husband did. I wish to examine the tax and payroll records for 1963 to 1968 to determine if in fact any employment is shown for Mrs. Treadwell, or if her husband's earnings record will support an inference that work performed by Mrs. Treadwell was credited to his account as in the case of the Florida crewleaders. This employment is particularly important as it is agricultural employment which would supply one quarter of coverage for each $100.00 so earned.

Subsequently, counsel submitted affidavits of friends and co-workers of Treadwell, purporting to support her claim of employment with Kaduk, Troncillito's, and the Florida crew leaders. He reiterated his request that Mrs. Treadwell's earnings be computed by reference to her husband's earnings, wherever the single payment method was used.

The subpoenas, which were important to Treadwell's case, were never enforced. The ALJ was unaware he had the power to pursue his original decision to obtain relevant material through the subpoena process. The official handbook issued by the Social Security Administration's Office of Hearings and Appeals, the relevant portion of which is set out in the margin,[9] provides that where there is failure to obey a subpoena, the ALJ should proceed with the hearing, and then decide whether to request enforcement via the Administration's Office of General Counsel. In either event, the ALJ is expected to include a memorandum explaining his choice.[10] Here, the ALJ followed neither course. Instead, he filed his decision concluding Treadwell had failed to establish the requisite number of quarters of coverage. He did not discuss the impact of Troncillito's and Kaduk's failure to comply with the administrative subpoenas. He refused to credit the testimony of Treadwell and her witnesses, and stated that communications received from alleged ex-employers "weaken[ed] the credibility of [Treadwell's case]." Thus, adverse responses to the question and answer procedure were relied on by the ALJ, and the unavailability of tax and payroll records was dis-

---

worked for them. I really feel as counsel to Mrs. Treadwell that we have to dig deeper into these records and press them to produce the payroll and tax records for the years.

**8.** The Troncillito's subpoena had been issued by the ALJ subsequent to the hearing, based upon testimony adduced.

**9.** 1–574 NONCOMPLIANCE WITH A SUBPENA

When there is refusal or failure to obey a subpena, the ALJ should ordinarily proceed with the hearing. It may be that, in the light of evidence presented at the hearing, the information sought through the subpena will not be required for a decision. If so, the ALJ will include the copy of the subpena in the CF with an explanatory memorandum.

If, after the hearing, the ALJ still believes the appearance of the subpenaed person is required, the ALJ will prepare a memorandum directed to the Regional Attorney, Office of the General Counsel, requesting enforcement of the subpena. The memorandum should set out in detail the circumstances of the case and explain why the information or evidence possessed by the subpenaed person is essential to the case.

**10.** The procedures prescribed by the handbook are cited approvingly by the Secretary in its brief on appeal to this court.

missed as unimportant "because of the period of time elapsed." Yet, submissions in support of Treadwell were disregarded precisely because they were made several years after the time in question. Moreover, although recognizing the possibility that the custom and usage of the migrant industry may have called for the issuance of only a single paycheck, to the head of the family, the ALJ declined to accept the argument that Treadwell's work may have been, in some situations, credited to her husband, whose wages should therefore be apportioned.[11]

The Secretary upheld the ALJ's decision, rejecting Treadwell's primary argument on appeal, that the ALJ's failure to pursue her two subpoena enforcement requests deprived her of a fair hearing. The Secretary concluded: "It appears that the individuals subpoenaed have no records to produce and unless you or your representative have evidence which would rebut the information obtained from them, it is not clear what evidence would be produced with their appearance."

Treadwell filed this action in the district court, 20 C.F.R. § 404.981 (1982). Although noting "the ALJ had no clear idea of the proper procedure [for enforcing a subpoena]," and further stating the record was silent on the question whether a decision was made not to seek enforcement (and if so, why), Judge Leval concluded that "it appears that the Secretary considered the request [made, at the suggestion of the ALJ, to the United States Attorney] and turned it down." Because such a denial was discretionary with the Secretary, see 42 U.S.C. § 405(e), and although "[i]t would seem a better practice for the Secretary to state on the record his reasons for denial of enforcement," the district judge affirmed

the final administrative decision and granted the Secretary's motion for judgment on the pleadings. We now reverse and remand.

## II

As the ALJ noted, even had Treadwell been able to substantiate only her claim of employment at Troncillito's, she would have proved sufficient quarters of coverage. The subpoena directed to that employer was requested by counsel, and issued by the ALJ, *after* the hearing. This answers the Government's contention that the ALJ weighed the evidence adduced before him and determined there was no need to secure Troncillito's tax and payroll records.[12]

Moreover, it is an elementary rule that the propriety of agency action must be evaluated on the basis of stated reasons. *See Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). In the case of noncompliance with a subpoena, the agency has recognized the desirability of having the ALJ articulate the basis for concluding that enforcement is or is not necessary. Because the ALJ was not aware of this procedure, the record is silent on what the Government alleges to have been his "decision" not to pursue enforcement. Regarding Troncillito's, the Gilberti letter is the only document in the file. The Government would therefore have us consider Treadwell's claim of employment at Troncillito's adequately refuted by the unsworn representations of one who was not the owner of the farm, and whose unsolicited personal attack on Treadwell's veracity makes his bias self-evident. In light of Troncillito's possible interest in the outcome of the proceeding, as an employer required to pay social security tax on any income

---

11. In support of this refusal, the ALJ stated: "An individual cannot elect to share earnings with another so as to establish entitlement for the other. Such action would run contrary to the entire theory and basis for the Social Security System." We have no occasion to pass on the legitimacy of employers aggregating earnings in this fashion. We note, however, that Treadwell can hardly be accused of "electing" to be so compensated.

12. We recognize it is not inconceivable the ALJ issued the subpoena but later determined its enforcement was unnecessary. But any claim that he so exercised his discretion is severely undermined by the unequivocal indication he did not understand he possessed power to request enforcement by the Administration and his sympathy to Treadwell's difficulty rebutting Troncillito's bald assertion she had not worked for the farm.

earned by Treadwell, *see Taylor v. Weinberger,* 528 F.2d 1153, 1156 (4th Cir.1975), we decline to do so.

It is utterly disingenuous to claim, as the Government does, that the Gilberti letter was not "sufficiently controversial to merit cross-examination of the author," *McLaughlin v. Secretary of HEW,* 612 F.2d 701, 704 n. 2 (2d Cir.1980). The question whether Treadwell had been employed at Troncillito's was crucial to her claim. Further, her ability to challenge Gilberti depended upon issuance of the subpoena. Treadwell was clearly unable to present evidence rebutting Gilberti's assertions. She has no formal education, and cannot sign her own name. It is unreasonable to expect her to have retained written records of her employment, which might have become, at some future date, relevant to a disability benefits proceeding she could neither anticipate nor understand. This circuit has repeatedly recognized the "right to subpoena *and* cross-examine [witnesses] submitting reports adverse to [disability] claims is important, particularly when there is 'substantial reliance' on the report by the hearing examiner." *Fernandez v. Schweiker,* 650 F.2d 5, 8 (2d Cir.1981) (citation omitted) (emphasis added).

Although *Fernandez* involved a pro se claimant, its rule, we believe, is applicable to this case. The extra protection afforded those "handicapped by ... inability to speak English well," *Gold v. Secretary of HEW,* 463 F.2d 38, 43 (2d Cir.1972), is not based on the *fact* of pro se representation, but derives from a judicial recognition that the pro se claimant is not otherwise likely to be able to rebut adverse reports. When, as in this case, the best efforts of counsel to obtain from his client the ammunition needed to attack those reports will necessarily fail, the appropriate course is for the ALJ to " 'scrupulously and conscientiously probe into, inquire of, and explore [by the subpoena process] all the relevant facts ....' " *Id.* at 43 (citation omitted). That the ALJ undertook this task, but did not recognize he had the means to complete it, does not cure the procedural defect in this case, but only demonstrates it may have been inadvertent.

The Secretary contends *Fernandez* only requires that "some" opportunity—*either* rebuttal or cross-examination of the declarant—be afforded the claimant. We think the *Fernandez* court would have employed the disjunctive if that had been its meaning. More significantly, however, the weakness of the Secretary's argument is revealed by the manner in which it is applied to this case. The Government claims no offense to fundamental fairness was committed here, because the ALJ's decision was based primarily on the testimony he heard, rather than on the hearsay evidence he also accepted into evidence, and in any event Treadwell was given "an extremely liberal opportunity to ... rebut [it]."

The latter point can be dealt with summarily. The right to subpoena adverse declarants, granted by the Secretary and noted in *Fernandez,* must contemplate either the reception into evidence of the subpoenaed material or the presence of witnesses to confront. And "cross examination" cannot reasonably be taken to refer to affirmative efforts of the claimant to "rebut" adverse reports by introducing evidence, since the point of *Fernandez* was that pro se claimants are "plainly unequal to the task of developing [their] own record[s]." *Fernandez v. Schweiker, supra,* 650 F.2d at 8.

Concerning the use made of hearsay evidence, even the Government concedes, as it must, that the ALJ's refusal to credit Treadwell's or her witnesses' testimony was influenced by the absence of corroborating income tax returns and the statements of various employers denying any work activity. Such statements were deemed "[s]uspicious factors ... [which] weaken[ed] the credibility of [Treadwell's] statements and witnesses," and the ALJ concluded that "[m]ore specific proof regarding dates worked and work performed is required ...." Yet the precise purpose of the administrative subpoenas was to assist Treadwell in securing "specific proof." Clearly, the ALJ's reliance on *ex parte* hearsay reports was "substantial." *Fernandez v. Schweiker, supra.*

144

The Government argues the evaluation of credibility is within the exclusive province of the ALJ, who was therefore empowered to decide that "the evidence which was produced from alleged co-workers was manufactured out of friendship." While we do not quarrel with the general principle, we note that the very cases which establish it, and are relied upon by the Government, establish also that credibility determinations may be impermissibly infected by an erroneous or incomplete view of the law. *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979); *McLaughlin v. Secretary of HEW, supra,* 612 F.2d at 704–05. In this case, the ALJ did not comprehend subpoena enforcement procedures provided by statute and regulation. His unawareness led to inaction, which in turn resulted in reliance upon adverse hearsay reports of ex-employers, including, in one case, attacks on Treadwell's credibility and integrity. We have previously held a similar scenario violative of due process "where the claimant was afforded no opportunity to subpoena and cross-examine the declarant," *Gullo v. Califano,* 609 F.2d 649, 650 (2d Cir.1979), and we reaffirm that holding here.

The "underlying reliability and probative value" of written medical reports which led the Supreme Court in *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), to conclude an ALJ's reliance upon them could amount to "substantial evidence" supporting a denial of benefits, does not apply to this case. Indeed, the Court's analysis persuades us that a remand is required in this case. *Perales* held that adverse reports, prepared by a presumptively unbiased physician, could constitute substantial evidence "when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician." *Id.* If the latter condition must be fulfilled when the hearsay declarant may safely be said not to have "any interest in the outcome of the administrative proceeding beyond the professional curiosity a dedicated medical man possesses," *id.* at 403, 91 S.Ct. at 1428, the direct pecuniary interest implicated here, *Taylor v. Weinberger, supra,* 528

F.2d at 1156, makes this case *a fortiori* one for its application. Moreover, the *Perales* Court relied on the consistency of the five medical reports submitted against the claimant. The present case stands in direct contrast. At different times, Manke and Mrs. Boyce offered different—and contradictory—stories of Treadwell's employment relationship with them. Thus, this case is attended by the "specter of questionable credibility and veracity" notably absent in *Perales, id.* 402 U.S. at 407, 91 S.Ct. at 1430.

In sum, the ALJ credited hearsay statements of alleged ex-employers although that evidence was never corroborated—and could have been contradicted—by documents and records he might have received and considered, had he understood his power to request enforcement of subpoenas he clearly regarded as worthy of issuance in the first instance. Damage to Treadwell's case was compounded by the effect of the hearsay on the ALJ's view of her credibility, an issue which might have been resolved differently had the subpoenas been enforced. We conclude that the combination of factors already cited resulted in a failure to afford Treadwell an opportunity to confront adverse hearsay reports and effectively denied her due process. *Cf. id.* at 402, 91 S.Ct. at 1427.

The case is remanded for further proceedings not inconsistent with this opinion.