Mertylin CARROLL, Plaintiff,

v.

SECRETARY OF the DEPARTMENT OF HEALTH & HUMAN SERVICES OF the UNITED STATES, Defendant.

No. 94 CV 1289.

United States District Court, E.D. New York.

Jan. 20, 1995.

Mertylin Carroll, pro se.

Zachary W. Carter, U.S. Atty. (Jorin Rubin, of counsel), Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiff brought this *pro se* action to challenge the final decision of the Secretary of the Department of Health and Human Services (the "Secretary") denying her application for disability benefits under the Social Security Act (the "Act").

Both parties move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

I

Plaintiff, born on February 13, 1932, attended 12 years of school in Jamaica and is literate in English. She completed a nurse's aide training course in 1968 and worked as a nurse's aide from 1956 to 1975. She says that she has been disabled since August 18, 1975 due to an injury to her left knee.

Plaintiff filed separate applications for Disability Insurance Benefits and Supplemental Security Income on March 26, 1990. In a decision dated February 7, 1991, an administrative law judge (an "ALJ") granted her request for supplemental security benefits as of March 26, 1990, but declined her request for disability benefits as of August 18, 1975. The Appeals Council (the "Council") denied plaintiff's request for review on November 29, 1991.

Plaintiff also filed at least one action with the New York State Workmen's Compensation Board (the "Board"). In a decision filed on August 10, 1976, a panel of the Board found that plaintiff was not entitled to workmen's compensation benefits.

On February 20, 1992 plaintiff sought review by this court of the denial of disability benefits. In early December 1992, the parties agreed by signed stipulation to remand this case to the Secretary, pursuant to *Stieberger v. Sullivan,* 792 F.Supp. 1376 (S.D.N.Y.1992), for further proceedings. The court "so ordered" the stipulation on December 17, 1992. Thereafter, the Council remanded the case to an ALJ for *de novo* proceedings.

The ALJ held a hearing on June 8, 1993. Because he found that plaintiff did not meet the disability insured status requirements of the Act after June 30, 1980, he restricted his inquiry to whether plaintiff was disabled on or before that date.

He determined that the following documents were "[t]he only medical evidence in the file subsequent to August 18, 1975 and prior to the date last insured":

1. Reports dated April 26, March 19, May 6, September 13, and December 1, 1976 from Dr. Stanley Soren.

2. A report dated June 14, 1976 from Dr. Patricia Harrow.

3. A report dated June 26, 1976 from Dr. Jack Kapland.

4. Reports dated September 10 and October 21, 1976 from Dr. Aubrey Griffith.

The ALJ noted that having reviewed the record, a medical expert found "no evidence of any impairment for the period prior to June 1980." The ALJ also stated that although plaintiff testified that she was treated by Dr. Griffith from 1976 until 1986, she acknowledged that there was no record of that treatment subsequent to 1976. Finally, the ALJ observed that Dr. Griffith did not respond to a subpoena for production of his office records.

The ALJ concluded that plaintiff was not disabled on or before June 30, 1980. He made the following formal findings:

1. Plaintiff met the disability insured status requirements of the Act through June 30, 1980.

2. The evidence does not establish that plaintiff has engaged in substantial gainful activity since August 1975.

3. Plaintiff has an injured left knee.

4. Plaintiff's allegations of pain and functional limitations prior to her date last insured appear exaggerated and are not credible given the paucity of medical treatment in this time period.

5. Plaintiff did not have any impairment that significantly limited her ability to perform basic work-related activities prior to June 30, 1980; therefore, plaintiff did not have a severe impairment prior to June 30, 1980.

6. Plaintiff was not under a disability as defined by the Act for purposes of disability insurance benefits at any time through June 30, 1980.

The Council declined plaintiff's request for review on February 28, 1994. This action followed.

II

The relevant medical evidence may be summarized as follows.

On August 18, 1975 plaintiff injured her left knee while helping to lift a patient at Kings Highway Hospital (the "Hospital"). She says that she suffers persistent progressive swelling and pain and has difficulty walking. She has taken medications including Naprosyn, Motrin and Anacin to relieve her symptoms.

Dr. Julius Schoenfeld, an emergency room physician at the Hospital, examined plaintiff on August 21 and October 10, 1975. Although he concluded that her condition was "completely orthopedically negative" he recommended that she should not perform work activities requiring heavy lifting or bending because she had a history of sciatica (pain radiating from the back.)

On September 3, 1975 plaintiff was examined by Dr. Bernard Levowitz, a physician who previously had treated her for a neuroma requiring herniorrhaphy. In reports dated September 19 and November 26, 1975, he stated that she had recovered fully and was capable of carrying out the physical duties of a nurse's aide. He made no reference to her knee injury.

Dr. Leo J. Koven, a consultative examiner, saw plaintiff on January 19, 1976. He found that her legs were capable of a full range of motion, and that "there were no motor, sensory or reflex changes." He stated that the "only possible finding of consequence was the presence of hypermobility of the patella (kneecap) bilaterally." He determined that if, as plaintiff had asserted, she had completely recovered from her sciatica, she could perform the duties of a nurse's aide, including bending, lifting and pulling.

Dr. Jack Kapland, a consultative examiner, examined plaintiff on May 26, 1976. He noted that plaintiff walked with no apparent limp and that she had no tissue swelling, increase in joint fluid or increase in mobility in either knee. X-ray examination of the left knee showed no evidence of fracture or dislocation. Dr. Kapland concluded that plaintiff was "capable of pursuing her work as a nurse's aide."

Plaintiff was examined by Dr. Patricia Harrow, a consultative examiner, on June 14, 1976. While plaintiff complained of intermittent sharp pains in her left knee, she did not state that it buckled or locked. Dr. Harrow observed some atrophy of plaintiff's left qua-

driceps and calf muscles and a "very mild defect of flexion and extension of the knee joint accompanied by pain." She concluded that plaintiff was "partially disabled," but noted that a final diagnosis would be premature.

Plaintiff also obtained ongoing treatment from two physicians, initially in order that reports of her condition be sent to the Board. Dr. Stanley Soren saw her five times between February 1976 and March 1977. In a report dated February 19, 1976, he diagnosed plaintiff as having a degenerative torn medical meniscus (pad of fibrocartilage) of the left knee, opined that she was disabled and would be for an unknown period of time, and stated that the injury might result in total or partial loss of that knee's function. He advised that an arthrogram of the knee be performed.

After an examination on March 19, 1976, Dr. Soren said that although plaintiff's knee buckled, it did not cause her to fall, and noted that an arthrogram of the knee was normal. He stated that plaintiff was fit for light duty, and recommended that she begin physical therapy.

On May 6, 1976 Dr. Soren wrote a note stating that plaintiff "was seen today and may return to full work on Monday, May 10, 1976." The record does not include any examination notes from that visit.

Apparently plaintiff continued to experience problems with her knee. When Dr. Soren examined her on August 30, 1976, she reported that she had pain walking. Dr. Soren diagnosed her as having synovitis (joint inflammation) and advised that she have underwater ultrasound therapy three times a week for three weeks and wear a knee cage.

Dr. Soren examined plaintiff on November 30, 1976 and March 4, 1977. In a report dated December 1, 1976, he recommended that plaintiff have an arthrotomy and medial meniscectomy (joint surgery). On March 9, 1977, he reported that plaintiff had "a major problem" in her left knee and diagnosed meniscal derangement. He again recommended a medial meniscectomy.

Plaintiff saw Dr. Aubrey Griffith four times between June and October 1976. After examining plaintiff on June 8 and August 5, 1976, Dr. Griffith reported that although she still complained of pain in her left knee she was not disabled.

Dr. Griffith saw plaintiff again on September 10 and October 21, 1976. He diagnosed her with probable chronic deranged meniscus, and said that plaintiff complained of increased pain in her knee. He indicated that he did not know when plaintiff could resume work, even work of a limited nature.

Plaintiff says that she continued to see Dr. Griffith until 1986. Her testimony is the only evidence of these later visits.

Plaintiff was treated by Dr. Peter Graham at the Kings County Hospital Emergency Room on July 5, 1984. At that time, she complained of continual pain in her left knee, and Dr. Graham noted that the knee was tender and swollen. He diagnosed plaintiff as having chronic tendinitis and a possible Baker's cyst (swelling caused by escape of joint fluid).

Finally, Dr. Howard Finkelstein, a medical expert, testified at the June 8, 1993 hearing. Having reviewed the record before the ALJ, he stated that it contained no evidence that plaintiff had seen any physicians other than Drs. Schoenfeld, Soren and Griffith in the period prior to June 1980.

### III

Because plaintiff proceeds *pro se,* the court reads her complaint especially liberally. *See Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Plaintiff says that the Secretary's decision is not supported by substantial evidence. Specifically, she argues that the ALJ erred by (1) considering the Board's decision dismissing her case, (2) considering certain medical evidence submitted by the Board, and (3) refusing her request that the ALJ and a doctor who testified at the hearing examine her knee.

The court may overturn the Secretary's determination only when it is not sup-

ported by substantial evidence. 42 U.S.C. § 405(g).

### A

Plaintiff says that in determining whether she was disabled the ALJ improperly considered the Board's decision dismissing her case. But the ALJ makes no reference to plaintiff's worker's compensation action in his decision. Plaintiff's argument is based on a false premise and is without merit.

Plaintiff also says that because the Board's decision "violated state law," the ALJ should not have considered any medical evidence deriving from the Board's investigation of her workmen's compensation claims.

The record does not indicate whether plaintiff authorized the Board to provide the ALJ with her medical records. But at the June 8, 1993 hearing, after the ALJ directed plaintiff's attention to the evidence that he would consider, including the Board's records, plaintiff did not object. She stated that having reviewed the documents, she felt that they supported her claim of disability.

Further, it appears that the only documentary medical evidence in the record, including reports from plaintiff's treating physicians, was supplied by the Board. The ALJ did not err in considering the medical evidence obtained from the Board's records.

Finally, plaintiff argues that at the June 8, 1993 hearing, the ALJ improperly refused her request that he and Dr. Finkelstein examine her knee.

The ALJ found and plaintiff does not contest that she last met the Act's disability insured status on June 30, 1980. Evidence of the state of plaintiff's knee in June 1993 was not relevant to the question of whether plaintiff was disabled prior to June 1980. As the ALJ noted during the hearing, there was no question that plaintiff had been continuously disabled since March 26, 1990. The ALJ did not err in refusing plaintiff's request.

### B

Plaintiff has the burden of "provid[ing] medical evidence" to show that she is disabled. 20 C.F.R. § 404.1512(c). But an ALJ has a heightened obligation to assist a *pro se* claimant, in particular to "assist the plaintiff affirmatively in developing the record." *Smith v. Bowen,* 687 F.Supp. 902, 906 (S.D.N.Y.1988).

Especially where an unrepresented claimant's record is inconsistent and incomplete, an ALJ must "scrupulously and conscientiously probe into, inquire of and explore all the relevant facts." *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir.1980).

Towards this end, an ALJ may issue a subpoena requiring the production of any evidence relating to a matter under his or her consideration. 42 U.S.C. § 405(d); *Treadwell v. Schweiker,* 698 F.2d 137, 141 (2d Cir.1983). In the event that a person served with a subpoena refuses to comply, the Secretary may seek enforcement by a federal district court. 42 U.S.C. § 405(e).

At the very least, before denying a *pro se* claimant's application, the ALJ should advise the claimant that "he considered his case unpersuasive, and ... suggest that he produce additional medical evidence or call [his treating physician] as a witness." *Santiago v. Schweiker,* 548 F.Supp. 481, 486 (S.D.N.Y. 1982).

In this case, plaintiff testified that she saw Dr. Griffith, one of her treating physicians, from late 1976 to 1986, but did not provide any documentation of that treatment. She explained that after her workmen's compensation case was closed in late 1976, Dr. Griffith "probably didn't file any more reports with the Board." It is not clear whether plaintiff relied upon the Board to submit these records or attempted to obtain them herself.

Although the ALJ issued a subpoena for Dr. Griffith's records, he apparently did not seek to have the subpoena enforced. Moreover, he neither suggested that plaintiff attempt to obtain and submit the records, nor explained that plaintiff could call Dr. Griffith as a witness. This is particularly significant because the record does not indicate whether plaintiff sought to obtain these records or instead assumed that they would be provided.

If plaintiff did in fact see Dr. Griffith between October 1976 and June 1980, his opinion as a treating physician regarding the degree of plaintiff's disability would be entitled to significant weight. 20 C.F.R. § 404.1527(d). In light of plaintiff's *pro se* status and the importance of Dr. Griffith's opinion of plaintiff's degree of disability between October 1976 and June 1980, the court concludes that the ALJ had a responsibility to develop the record more fully.

In addition, the court observes that in his decision, the ALJ did not consider the entire record. In particular, he overlooked the reports of Drs. Schoenfeld, Levowitz, and Koven, as well as some of Dr. Soren's reports.

Furthermore, the court notes that the ALJ stated that Dr. Finkelstein testified that he found no evidence of any impairment for the period prior to June 1980. In fact, Dr. Finkelstein did not give an opinion regarding plaintiff's purported impairment.

The court makes note of these errors in order to assist the ALJ in considering the record on remand.

## IV

The court remands the case for further proceedings consistent with this opinion. Before conducting another hearing, the ALJ shall apply for enforcement of the subpoena of Dr. Griffith's records. The ALJ shall also direct plaintiff to attempt to obtain those records or ask Dr. Griffith to testify.

So ordered.