Florence SOBOLEWSKI, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security,[1] Defendant.

No. CV 96–6148.

United States District Court, E.D. New York.

Nov. 19, 1997.

---

**1.** Kenneth S. Apfel was sworn in as Commissioner of Social Security on September 29, 1997. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel is substituted for John J. Callahan as the defendant in this action.

Charles E. Binder, Steven S. Landis, Binder and Binder, Jericho, NY, for Plaintiff.

Zachary W. Carter, U. S. Atty. Gen. by Randi S. Weinberg, Asst. U. S. Atty., Brooklyn, NY, for Defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff seeks judicial review, pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), of a final determination of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits. Both parties have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The only issue before the Court is whether the Commissioner's decision is supported by substantial evidence and based upon the correct legal standards. For the reasons discussed below, plaintiff's motion is granted to the extent that the case is remanded to the Commissioner for further administrative proceedings. Defendant's motion is denied.

## BACKGROUND

### I. Procedural History

Plaintiff applied for Social Security disability insurance benefits on September 23, 1994, claiming an onset date of March 23, 1994, and alleging the following disabling conditions: pancreatitis, arthritis of the legs, feet, arms, and hands, bursitis of the right foot, and macroamlyasemia. Transcript of Administrative Record ("Tr.") 41–44, 70–77. The Social Security Administration ("SSA") denied her application initially (Tr. 46, 55–57) and upon reconsideration. Tr. 45, 62–64. Plaintiff requested a hearing (Tr. 65) which was held on January 5, 1996, before an administrative law judge ("ALJ"). Tr. 29–38.

By decision dated February 29, 1996, the ALJ concluded that plaintiff was not disabled within the meaning of the Act. His conclusion was based on a finding that, although plaintiff's impairments prevented her from engaging in her past work as a mental hygiene therapy aide, she remained physically capable of performing sedentary work and, given her age, education, and work experience, she was able to engage in gainful employment within the national economy. Tr. 13–20. Plaintiff timely appealed and provided additional medical evidence to the Appeals Council and an explanatory letter from her counsel. Tr. 145–49. The Appeals Council denied review on October 23, 1996, tersely stating:

> The Appeals Council has also considered the contentions raised in your representative's letter dated October 9, 1996, as well as the additional evidence from P. Parikh, M.D. dated February 6, 1996 and from Max I. Hamburger, M.D. dated April 22, 1996, but concluded that neither the contentions nor the additional evidence provides a basis for changing the Administrative Law Judge's decision.

Tr. 3–4. Because the Appeals Council declined to review the ALJ's February 29, 1996 determination, that determination became the final decision of the Commissioner. *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir.1996). Plaintiff then commenced this action contending that the Commissioner lacks substantial evidence to support his decision because he failed to credit additional medical evidence from plaintiff's treating physicians provided to the Appeals Council, did not consider plaintiff's nonexertional limitations, and did not consider plaintiff's work history when assessing the credibility of plaintiff's description of her disability.

### II. The Administrative Record

#### A. Vocational Evidence

Plaintiff was born on January 21, 1953, and was forty-three years old at the time of the ALJ's decision. Tr. 41. Plaintiff completed high school in June 1972. Tr. 74. Shortly thereafter, plaintiff began to work as a mental hygiene therapy aide at Pilgrim State Psychiatric Center ("Pilgrim State"), a position she held through March 23, 1994. Tr. 139. As an aide, she assisted patients in various aspects of their daily life, engaged in recreational activities with them, and intervened during fights. Sometimes she would help patients to get up from a chair or off the floor. Tr. 33, 74–75, 139.

During the hearing before the ALJ, plaintiff offered the following testimony as to the history of her ailments, her work history, and her current activities. She stopped working at Pilgrim State after experiencing a sharp, right-sided pain that she later learned was pancreatitis. Tr. 33. She still experiences

constant right-sided pain. Tr. 34, 37. She can walk up to four blocks, stand for ten minutes, and sit one-half hour. Tr. 35. She becomes uncomfortable sitting in one spot. Jr. 36. She has not attempted to return to work full time. Jr. 37. Her daily activities include the light re-heating of food, folding laundry, sewing, watching television, and socializing with friends. Jr. 73. She occasionally drives herself to her doctor's office. Jr. 73.

On December 12, 1994, she was examined by Dr. Harry Kousourou on behalf of the Commissioner. Dr. Kousourou reported that plaintiff's daily activities included personal care, watching television, cooking, doing laundry, tidying the house, and socializing. Jr. 118.

### B. *Medical Evidence Before the ALJ*

#### 1. *Abdominal Pain*

At the time the ALJ rendered his decision, the following medical information was on record. One of plaintiff's treating physicians, Dr. Prakashchandra Parikh, began treating plaintiff on March 15, 1993, nine days before plaintiff ceased her employment at Pilgrim State. Jr. 114. On March 23, 1994, plaintiff had severe pain in the upper right quadrant, fever, nausea, bloating and loss of appetite. Jr. 115. An abdominal ultrasound, performed on April 1, 1994, revealed a small left para-pelvic renal cyst. Jr. 134.

Plaintiff's right upper quadrant pain persisted and Dr. Parikh admitted her to Good Samaritan Hospital on April 18, 1994, with a chief complaint of right upper quadrant abdominal pain since March 31. Jr. 84, 87. Laboratory testing revealed an increased level of amylase, an indicator of pancreatitis. Dr. Parikh's diagnosis was acute pancreatitis and right upper quadrant pain, etiology to be determined. Jr. 84–85, 87–88. Parikh referred plaintiff to Dr. Paul Broomfield, a gastroenterologist, for further evaluation of the plaintiff during her hospitalization.

On April 19, 1994, Dr. Broomfield noted that plaintiff had been admitted to Good Samaritan Hospital in 1992 for pancreatitis and observed that her condition improved with bed rest but worsened with movement.

He opined that plaintiff had chronic, rather than acute pancreatitis. Tr. 89–91. An abdominal ultrasound, performed the same day, showed mild hepatocellular disease changes of the liver, bilateral renal cysts, and mild edematous changes of the pancreas. Tr. 85, 94–96. On April 20, an abdominal CAT scan showed the bilateral renal cysts, but no evidence of pancreatitis. Tr. 85, 97. In his discharge summary, Dr. Parikh indicated that plaintiff's final diagnoses were: macroamylasemia, chronic pancreatitis, kidney cyst, liver disorder, and mixed hyperlipidemia. Tr. 84. He further noted that plaintiff had felt better in the course of time and was discharged on April 25, 1994. Tr. 86.

On May 5, 1994, at Dr. Parikh's request, Dr. Broomfield again evaluated plaintiff. He reported to Dr. Parikh that plaintiff had been doing well, with the exception of occasional right upper quadrant pain during damp weather or during periods of stress or tension. Tr. 128. Plaintiff reported that she could avoid pain if she drank a great deal of fluid during the day. Tr. 128. Upon examination, her abdomen was soft and non-tender, and Dr. Broomfield opined that her pain was either functional, musculoskeletal, or due to non-ulcer dyspepsia. Tr. 128. He advised that further testing would be performed to determine the status of plaintiff's possible macroamylasema. If confirmed, however, no further therapy or evaluation would be warranted. Tr. 128.

On September 12, 1994, Dr. Broomfield again evaluated plaintiff. He confirmed the blood test's finding of macroamylasemia, and noted that she continued to experience occasional bouts of right upper quadrant pain that usually occurred during periods of stress, tension, or anxiety. He further noted that plaintiff was eating well, had normal bowel movements, and had no significant change in weight. Tr. 130. Her abdomen was soft and non-tender. Tr. 130. Because Dr. Broomfield believed that her abdominal pain was either "functional or due to non-ulcer dyspepsia," he ordered an upper gastrointestinal X-ray series. Tr. 130. The series, performed on September 14, 1994, revealed a soft tissue mass in the mid-abdomen, probably a renal cyst, and a hiatal hernia. Tr. 129.

On October 12, 1994, Dr. Broomfield indicated that plaintiff had been doing well taking Phazyme, a non-prescription anti-flatulent. Tr. 131. She had little, if any, problem with abdominal pain, was eating well, and denied any other significant problems. Tr. 131. Dr. Broomfield opined that plaintiff's pain was either functional or due to some type of large or proximal small bowel motility disorder. Tr. 131. He did not feel that any further evaluation was necessary. Tr. 131.

Responding to a form request from the New York State Department of Social Services, Office of Disability Determinations, Dr. Parikh provided an unsigned and undated report that dealt with plaintiff's condition up to October 26, 1994. Tr. 114–17. Dr. Parikh stated that her symptoms included right upper quadrant pain that occurred "off and on" and was "[m]ost severe at times of stress." He diagnosed pancreatitis. Tr. 114. However, the administrative record with respect to this unsigned and undated report is incomplete. Although the report indicates on its face that it comprises seventeen pages, pages four through fifteen are missing. Tr. 114–17. Based on a comparison with a similar report in file from plaintiff's podiatrist, it appears that the missing pages concerned, inter alia, plaintiff's capacity to lift, carry, stand, walk, sit, push, and pull—i.e., the elements pertinent to determining her residual functional capacity.

Dr. Rebeco Yu, a urologist, reported to Dr. Parikh by letter dated December 20, 1994, that plaintiff had been seen earlier in the year by Yu's associate, Dr. Mucciolo, for pain in the right flank. Jr. 132. At that time, a sonogram had revealed a renal cyst. An abdominal examination at that time had been essentially unremarkable. Upon return to Yu's office on or about December 20, plaintiff complained of "some vague right upper abdominal discomfort but no gross hematuria." Jr. 132. A repeat sonogram revealed bilateral renal cysts. Upon examination, slight tenderness of the upper right quadrant was noted, although no definite mass was felt. Jr. 132.

On December 24, 1994, Dr. Harry Kousourou, a board-certified internist, performed a consultative examination of plaintiff on behalf of the Commissioner. He noted that plaintiff complained of a constant throbbing sensation in the right lower quadrant, but found only mild epigastric and right upper quadrant tenderness upon deep palpation, without evidence of masses, or organomegaly. Jr. 118–19. After a complete physical examination, Dr. Kousourou's impression was a history of recurrent pancreatitis, possibly due to hyperlipidemia, and hypertension under good control with medication. Jr. 119–20. He did not provide any assessment of plaintiff's residual functional capacity, despite the requirement in SSA's regulations that a report of a complete consultative physical examination should describe the plaintiff's ability to perform work-related activities such as sitting, standing, walking, lifting, carrying, and handling objects. 20 C.F.R. § 404.1519n(c)(6).

On March 28, 1995, Dr. Parikh responded to an information request from Pilgrim State, plaintiff's employer, regarding a possible assignment to modified duty. Dr. Parikh listed plaintiff's diagnoses as pancreatitis and anemia, stating that her prognosis was "guarded." Jr. 137. He noted that exertion, such as lifting and bending, caused pain. Dr. Parikh was unsure whether plaintiff could return to full duty in 90 days and advised Pilgrim State that "light duty should be tried first. The patient may do well, or she may have severe pain which will mean total disability." Tr. 137.

### 2. *Foot Pain*

The following medical evidence pertaining to plaintiff's foot problems was before the ALJ at the time of his decision. On November 17, 1994, plaintiff's podiatrist, Dr. Kenneth E. Coombs, reported that he had first treated plaintiff on September 17, 1987, and had last seen her on October 6, 1994. Tr. 104–13. Dr. Coombs is not a physician; rather, he is a doctor of podiatric medicine. Tr. 113. His treating diagnoses included metatarsalgia, capsulitis secondary to a hypertrophic second metatarsal of the right foot, and history of rheumatoid arthritis. Tr. 104. Her symptoms as of the time of the report included pain and swelling of the ball of the right foot, and an inability to stand or

walk for any length of time. Tr. 104. Clinical findings included loss of the plantar fat pad, tenderness, and mild dorsiflexure contracture of the second metacarpophalangeal joint of the right foot, and an antalgic gait pattern secondary to pain. Tr. 105, 111, 112. X-rays revealed a hypertrophic second metatarsal bone on the right foot. Tr. 106. Plaintiff was treated with an anti-inflammatory steroid, local anesthetic, physiotherapy, whirlpool and ultrasound. Tr. 105. Plaintiff was fitted with an orthotic to help reduce the mechanical pressure on the ball of her foot. Tr. 106.

On December 12, 1994, Dr. Kousourou examined plaintiff's feet and found them to be normal. Tr. 119. X-rays of the foot were normal. Tr. 121.

### 3. *Other Claimed Disabilities*

In addition to pancreatitis, macroamlyasemia, and bursitis of the right foot, plaintiff stated in her application for disability benefits that she suffered from arthritis of the legs, feet, arms, and hands. In April 1994, Dr. Parikh noted tenderness in plaintiff's right knee. Tr. 85. None of Dr. Parikh's records make any reference to arthritis. However, on November 17, 1994, Dr. Coombs noted that plaintiff had a history of rheumatoid arthritis. Tr. 104. On December 12, 1994, Dr. Kousourou examined, inter alia, plaintiff's extremities, motor and sensory systems, and her station and gait. Tr. 119. He found all to be normal but for crepitus upon flexion of the knees. Tr. 119. As noted, X-rays of the foot were described by the interpreting radiologist as normal. Tr. 121. X-rays of plaintiff's hands were also described by the radiologist as normal, although he noted that "[n]arrowing of the distal joint of the fifth digit is probably related to osteoarthritis." Tr. 121. Although Dr. Kousourou performed a complete examination of plaintiff and took her medical history, his report is silent as to rheumatoid arthritis. Tr. 118–20.

### 4. *Residual Functional Capacity*

As noted, *supra*, the state agency charged with making a disability determination requested that Dr. Parikh respond to a form request that, inter alia, sought information regarding plaintiff's residual functional capacity. The pertinent pages are missing from the administrative transcript. As noted above, in correspondence to Pilgrim State, Dr. Parikh suggested that plaintiff might return to work on light duty and do well, but that she might experience severe pain that would bar her from working.

Plaintiff's podiatrist, Dr. Coombs, stated that plaintiff could stand and walk less than two hours per day, Tr. 112, further noting that plaintiff was unable "to stand or walk for any length of time." Tr. 104. He also opined that her ability to push and pull with her lower extremities, primarily her foot, was limited. Tr. 112. Notwithstanding that his practice is limited to the care of the feet, Dr. Coombs went on to opine that plaintiff could lift and carry a maximum of 20 pounds, sit without limitation, use her upper extremities to push or pull without limitation, and had no postural, manipulative, visual, communicative, or environmental limitations. Tr. 112.

### C. *The ALJ's Development of the Medical Record*

The January 5, 1996 hearing before the ALJ commenced at 9:35 a.m. and concluded at 9:45 am. Tr. 31, 38. Plaintiff was accompanied by counsel. No witnesses were called other than plaintiff. During the ten minute hearing, the ALJ questioned plaintiff about the last date she worked in 1994 and her income for that year. Tr. 31–32. After a brief examination of plaintiff by her counsel as to her symptoms, pain, and ability to stand, walk, and sit, the ALJ asked plaintiff a few questions to clarify the circumstances under which she felt pain upon moving or when sitting. These questions were directed to the right upper quadrant pain that plaintiff alleged to result from her pancreatitis. The ALJ did not question plaintiff about her claims of bursitis or arthritis. He asked no questions as to plaintiff's capacity to lift, carry, stand, push or pull, nor did he seek to elicit information as to the circumstances under which her pain was exacerbated by stress.

### D. *Medical Evidence Submitted to the Appeals Council*

After the ALJ rendered his decision, plaintiff submitted additional medical evidence to

the Appeals Council. Tr. 5. Dr. Parikh, in a letter dated February 6, 1996, noted that plaintiff had been under his care for pancreatitis since 1994, had been hospitalized in April 1994, and suffered her last major attack of pancreatitis in December 1995. He added that "[s]tress causes an exacerbation of her condition along with strenuous labor. For this reason [plaintiff] has been unable to return to work." Tr. 147.

Plaintiff also submitted a report from Dr. Max Hamburger, an internist and rheumatologist, who had been treating plaintiff since August 8, 1995. The Court notes that, during the hearing before the ALJ on January 5, 1996, plaintiff sought and was granted a three week extension to secure the report from Dr. Hamburger. Tr. 37–38. When plaintiff failed to submit the report at the end of the three week period, the ALJ, without being requested to do so, extended another fifteen days to plaintiff. Tr. 18. Again, plaintiff failed to submit the report by the due date, February 10, 1996. The ALJ issued his opinion on February 29, 1996.

Turning to the substance of Dr. Hamburger's report, he first recounted plaintiff's complaints as she described them:

> At this time the patient informed me that she was out on a sick leave from Pilgrim State because of a diagnosis of pancreatitis. She stated that she had been hospitalized and treated for pancreatitis over a period of time and that the cause of her recurrent pancreatitis was not clear. She also reported a history of back problems for which she was treated with Lodine.[2] She reported that her back pain dated to the 1970's. The patient stated that she has a responsibility of her job handling and moving patients and that she was not able to do so because of an incapacity of her lower back. The patient also complained of pain in her neck. She complained of occasional pain in her lower back or her neck causing her to drop a cup of coffee when lifting it. The patient also had a complaint of a nodule of the right number four toe joint which had been injected

without value. The patient stated that she occasionally had swelling of the hands and the wrists. The patient also had a complaint of knee pain worsened with barometric change. She described a click in her knee. The patient stated that functionally she was able to perform her activities of daily living for approximately a half an hour but after a half an hour had significant back and foot pain and therefore had to stop.

Tr. 148.

Dr. Hamburger's report went on to describe his clinical findings.

> On physical exam the pertinent findings were as follows. The patient had limited lateral rotation of her cervical spine to 45 degrees. There was tenderness on palpation of the paraspinal musculature of the cervical, dorsal, and lumbar spine. Both sacroilliac joints were quite tender. Her deep tendon reflexes were symmetric and intact. The MCP joints were all tender but there was no swelling. Grip strength was markedly reduced to 6 kilograms on the right and 12 on the left. Tinel's sign was negative. There was pain on abduction of the shoulders against resistance. There was pain on range of motion of the wrists. Range of motion on the hips and knees caused lower back pain. There was crepitus on range of motion of the knees. An X-ray of the lumbar spine revealed sacroiliitis and frontal squaring as well as degenerative disc changes at L5–S1. X-rays of the hands and the thoracic spine were unremarkable.

Tr. 148–49.

Dr. Hamburger then provided his diagnosis resulting from this initial meeting.

> My impression based on the extent of her joint symptoms was that she had degenerative arthritis and degenerative disc disease of the lower back as well as spondyloarthritis. Laboratory evaluation confirmed the impression of spondyloarthritis because the patient was found to be HLA–B27 positive. I initially suggested

---

**2.** Lodine is a non-steroidal anti-inflammatory drug used in the management of pain. Physi- cians' Desk Reference 830–31 (50th ed.1996).

an increase in the Lodine to three times a day as well as a trial of exercise. Tr. 149.

On November 14, 1995, during a followup visit, plaintiff reported that she was only taking Lodine twice a day but was able to maintain an acceptable level of discomfort. Plaintiff told Dr. Hamburger that she had reduced her daily dose because she feared gastrointestinal intolerance. Tr. 149. Dr. Hamburger's "impression at this time was that the patient's spondyloarthritis and osteoarthritis were stable at a sedentary level." Tr. 149.

Plaintiff was last seen by Dr. Hamburger on February 15, 1996.

At this time she stated that she was stable on Lodine and with an avoidance of stress. The patient continued to have knee symptoms. Physical exam revealed crepitus of significance on flexion of the knees to 100 degrees. A biomechanical spine and lift analysis was performed. On this test the patient was found to have a marked reduction in range of motion and strength in her ankles with significant although lesser reduction in the hips and in the knees. The patient was found to have a maximum lifting capacity of 10.95 kilograms once. Because of the anatomy of her lower back it is my opinion that this maximum lifting capacity of 10.95 kilograms represents a lifting capacity that the patient may occasionally accomplish however it is certainly clear that the patient may not continue to repeatedly lift any weight of this amount. In particular because of the marked reduction in functional capacity of the hips, knees and ankles this patient's capacity to use her lower extremities in any kind of gainful employment is markedly compromised.

Tr. 149. Dr. Hamburger concluded that plaintiff was disabled because of her lumbar spine osteoarthritis as well as her spondyloarthritis. Tr. 149.

### DISCUSSION

### III. *Applicable Law*

#### A. *Standard of Review*

The Court may set aside a final decision of the Commissioner only if it is not supported by substantial evidence or is based upon an erroneous legal standard. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982). Substantial evidence is "more than a mere scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" *Perez*, 77 F.3d at 46 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). The reviewing court does not conduct a de novo review as to whether the claimant is disabled, *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980), nor may it substitute its own judgment for that of the Commissioner. *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991); *Valente v. Secretary of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984). When the Commissioner's decision is not supported by substantial evidence, a reviewing court must reverse the administrative decision because "the entire thrust of judicial review under the disability benefits law is to insure a just and rational result between the government and a claimant...." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988).

#### B. *The Commissioner's Procedure for Evaluating Disability Claims*

A claimant for disability insurance benefits under the Act is eligible only if her impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). The Second Circuit has described the five-step process used to evaluate disability claims:

The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix I of the regulations. When the claimant has

such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working. *Perez,* 77 F.3d at 46; *see also* 20 C.F.R. § 404.1520 (regulations governing five-step process). Where a claimant has multiple impairments, the Commissioner must consider the combined effect of those impairments in determining the claimant's ability to work. *Dixon v. Shalala,* 54 F.3d 1019, 1031 (2d Cir.1995).

The ALJ found that plaintiff had satisfied the first four steps: 1) she had not engaged in substantial gainful activity; 2) she had severe impairments resulting from pancreatitis, hyperlipidemia, anemia, and degenerative arthritis if the feet; 3) her impairments did not rise to the level of a listed impairment; and 4) she could not perform her past relevant work. Tr. 17–19. Plaintiff does not dispute the findings in the first four steps. She does, however, dispute the fifth determination—that she retained the residual functional capacity to perform a full range of sedentary work and, consequently, was not entitled to disability benefits. Tr. 18–19.

Residual functional capacity ("RFC") is defined in the regulations governing Title II disability claims as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." Appendix 2, 20 C.F.R. Part 404, Subpart P § 200.00(c); *see* 20 C.F.R. § 404.1545(a) ("Your residual functional capacity is what you can still do despite your limitations."). It is an administra-

tive assessment of the extent to which a claimant's medically determinable impairment(s), including any related symptoms such as pain, may cause physical or mental limitations that may affect the claimant's capacity to perform work-related physical or mental activities. Social Security Ruling ("SSR") 96–9P, 1996 WL 374185, at *1.[3]

In determining a claimant's capacity to perform work-related physical activities, the claimant's ability to sit, stand, walk, lift, carry, push, and pull must be considered, as well as her ability to reach, handle, stoop, or crouch. 20 C.F.R. § 404.1545(b). Additionally, the regulations recognize that a claimant's other symptoms may cause a limitation of function beyond that which can be determined on the basis of the claimant's physiological abnormalities alone. 20 C.F.R. § 404.1545(e). RFC is assessed at each level of administrative review based on all of the relevant evidence in the case record, including information about the claimant's symptoms and any statements submitted by acceptable medical sources about what the claimant can or cannot do. *See* SSR 96–9P, 1996 WL 374185, at *2. In addition to medical facts, and diagnoses and medical opinions based on such facts, relevant evidence includes subjective reports of pain testified to by the claimant. *Ferraris v. Heckler,* 728 F.2d 582, 585 (2d Cir.1984).

To determine RFC, the Commissioner makes a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, *see* SSR 96–9P, 1996 WL 374185, at *2, based on medical reports from acceptable medical sources that include the sources' opinions as to the claimant's ability to perform each activity. *See* 20 C.F.R. § 404.1513(c)(1). The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work, which may be categorized as sedentary, light, medium, heavy, or very heavy. SSR 96–9P, 1996 WL 374185, at *2. The Commissioner bears the burden of demonstrating the claimant's capacity to perform

---

**3.** Social Security Rulings constitute the Social Security Administration's interpretation of the statute it administers and its own regulations.

*Quang Van Han v. Bowen,* 882 F.2d 1453, 1457 (9th Cir.1989).

each of the RFC elements, *Gray v. Chater*, 903 F.Supp. 293, 300 (N.D.N.Y.1995), and must proffer specific medical evidence in support of such demonstration. *Koseck v. Secretary of Health and Human Servs.*, 865 F.Supp. 1000, 1013 (W.D.N.Y.1994).

■ As defined in the regulations, sedentary work:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). SSA's interpretation of this regulation further notes that "[m]ost unskilled sedentary jobs require good use of the hands and fingers for repetitive finger actions." SSR 83–10, 1983 WL 31251, at *5. "Occasionally" means occurring from very little to up to one-third of the time. In particular, standing and walking should generally total no more than about two hours of an eight hour workday, and sitting should generally total about six hours of the workday. *Perez*, 77 F.3d at 46; SSR 83–10, at *5.

The burden falls upon the Commissioner at the fifth step of the disability evaluation process to prove that the claimant, if unable to perform her past relevant work, is able to engage in gainful employment within the national economy. To facilitate this task of matching the claimant's work capacity to jobs existing in the national economy, the Social Security Administration has developed a set of formulae, known as the Medical–Vocational Guidelines or "grids." 20 C.F.R. § 404, Subpart P.App.2., Rule 200.00. By matching the claimant's age, education, and work experience with a claimant's RFC, the grids mandate conclusions as to a claimant's ability to engage in gainful employment and, consequently, her status as disabled or not disabled. *See Pratts v. Chater*, 94 F.3d 34, 38–39 (2d Cir.1996) (if claimant's characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether she is disabled).

Exclusive reliance on the grids is inappropriate if the grids fail to accurately describe a claimant's particular limitations. 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e). The grids may not be applied where the claimant's exertional impairments are compounded by significant nonexertional impairments that reduce the claimant's ability to work at her RFC. 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e)(2), 201.00(hh); *Pratts*, 94 F.3d at 38–39; *Bapp v. Bowen*, 802 F.2d 601, 604–05 (2d Cir.1986). Exertional impairments are physical limitations that affect the claimant's ability to meet the strength demands of jobs in terms of the claimant's strength for sitting, standing, walking, lifting and the like. 20 C.F.R. § 404.1569a(a), (b). A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain. 20 C.F.R. § 404.1569a (a), (c).

■ The applicability of the grids must be considered on a case-by-case basis. *Pratts*, 94 F.3d at 39. Use of the grids is inappropriate if the nonexertional limitation significantly diminishes the claimant's work capacity beyond that caused by his exertional limitations. *Id.* A claimant's work capacity is significantly diminished if her nonexertional limitation causes a more than negligible loss of work capacity beyond that due to her exertional limitation. *Bapp*, 802 F.2d at 606. If application of the grids is inappropriate, the Commissioner must engage a vocational expert to testify to the claimant's capacity to work. 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e)(2); *Pratts*, 94 F.3d at 39; *Bapp*, 802 F.2d at 605–06.

## IV. *Analysis*

■ As a threshold matter, the Commissioner argues that this Court should not consider the additional medical evidence submitted to the Appeals Council both because it is not new and material and also because plaintiff lacks good cause to explain her "failure to incorporate such evidence in the adminis-

trative record." Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Commissioner's Motion") at 24. The argument is not well taken.

As the regulations make clear, the Appeals Council may consider only such evidence as is "new and material." 20 C.F.R. § 404.970(b). In its letter denying review of plaintiff's case, the Appeals Council expressly stated that it had considered the additional information submitted by plaintiff, thereby making an implicit finding that the evidence was, in fact, new and material. It is well settled that "[n]ew evidence submitted to the Appeals Council following the AL's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the AL's decision." *Perez*, 77 F.3d at 45. In any event, the Court agrees with the Appeals Council's implicit finding. Dr. Parikh's letter adds to the medical record the observation that plaintiff suffered an additional, major attack of pancreatitis in December of 1995, while Dr. Hamburger's report contains a number of new diagnoses, notably that plaintiff suffers from spondyloarthritis and lumbar spine osteoarthritis.

■ As for the "good cause" requirement suggested by the Commissioner, the Second Circuit has expressly held that a plaintiff need not make a showing of good cause to submit new evidence to the Appeals Council, although such a requirement is imposed when a plaintiff seeks to bring before the district court evidence not previously submitted during the administrative process. *Perez*, 77 F.3d at 45. The authorities cited by the Commissioner in support of his argument do not aid his case. The Commissioner relies upon *Perez*, even though *Perez* reaches the contrary conclusion. The Commissioner also cites two Second Circuit cases that simply stand for the proposition that plaintiff must demonstrate good cause to present new evidence to a court when that evidence was not previously presented to the Commissioner. *See* Commissioner's Motion at 24, citing *Lisa v. Secretary of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir.1991) (evidence prof-

fered for first time to district court); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir.1988) (evidence proffered for first time to Court of Appeals).

■ Consequently, when, as here, the Appeals Council denies review after considering new evidence, this Court "simply review[s] the entire administrative record, including the new evidence, and determine[s], as in every case, whether there is substantial evidence to support the decision of the [Commissioner]." *Id.* at 46.

■ Turning to the merits, plaintiff disputes the AL's finding that she is capable of performing sedentary work. Tr. 18. The ALJ based his conclusion:

> primarily upon the reports of Drs. Parikh, Broomfield, and Coombs, that the claimant has only mild abdominal pain and foot pain. In an eight-hour workday, the claimant can sit for at least six hours, stand/walk for two hours, and lift/carry up to twenty pounds.

Tr. 18. The ALJ further noted that "[a]fter examining the claimant on October 9, 1994, Dr. Parikh stated that the claimant had pain in the upper right quadrant, but did not specify any limitations of sitting, standing/walking, or lifting/carrying. (Exhibit 14)." Tr. 17–18.[4] The ALJ also observed that Dr. Coombs, the podiatrist whom plaintiff saw for foot pain, "evaluated the claimant's residual functional capacity and stated that, in an eight hour workday, the claimant could sit without limitation, stand/walk less than two hours, and lift/carry up to twenty pounds occasionally." Tr. 18. The Court finds that the ALJ applied an erroneous legal standard in his consideration of Dr. Coombs' report because he incorrectly treated the report as a medical opinion. Moreover, even if Dr. Coombs' report qualified as a medical opinion, the Court finds that the AL's decision that plaintiff could perform sedentary work is not supported by substantial evidence.

Turning first to Dr. Coombs' report, the ALJ, after discussing the evidentiary weight

---

4. After a thorough review of the administrative transcript, the Court is unable to locate any evidence regarding the examination by Dr. Parikh said to have taken place on October 9, 1994.

accorded to treating medical sources, described Dr. Coombs, along with Drs. Parikh and Broomfield, as plaintiff's treaters and twice characterized each doctor's records and reports as "medical evidence." Tr. 17–18. In so doing, the ALJ treated the RFC assessment of Dr. Coombs, the podiatrist, as a treating source's medical opinion on a par with the opinions of plaintiff's physicians, Drs. Parikh and Broomfield. Tr. 17–18. However, in *Diaz v. Shalala*, 59 F.3d 307 (2d Cir.1995), the Second Circuit made it clear that only the types of health care professionals listed in SSA's regulations as "acceptable medical sources" are qualified to provide medical opinions. *Id.* at 313. Under the pertinent regulation, podiatrists are not listed as an acceptable medical source. 20 C.F.R. § 404.1513(a) (treating sources are limited to licensed physicians, licensed osteopaths, licensed or certified psychologists, and licensed optometrists). Consequently, Dr. Coombs' opinion is properly treated merely as a non-medical opinion that may aid in understanding how plaintiff's impairments affect her ability to work. *See Diaz*, 59 F.3d at 313 (holding chiropractor's opinion to be non-medical source of information that may aid in understanding claimant's impairments); *Hernandez v. Commissioner of Social Security*, 96–CV–1585, 1997 WL 566119, at *4 (S.D.N.Y. Sept.10, 1997) (podiatrist, like chiropractor, is non-treating source; relying upon *Diaz* ); *see also* 20 C.F.R. § 404.1513(e) (discussing non-medical opinions from health care professionals).

■ Although the ALJ has the discretion to determine the appropriate weight to accord a podiatrist's opinion based on all the evidence in the record, *see Diaz*, 59 F.3d at 313–14, there is no indication in the AL's opinion that he considered Dr. Coombs as anything other than an acceptable medical source who could render a medical opinion. Because the ALJ applied an incorrect legal standard to the evidence before him, his decision denying benefits may be reversed on this ground alone.

■ Moreover, the AL's opinion does not suggest that he limited the weight accorded to Dr. Coombs' non-medical opinion to Coombs' field of expertise, namely, the diag-

nosis and treatment of medical conditions of the feet. *See* N.Y. Educ. Law § 7001 (McKinney 1985) (defining practice of podiatry as diagnosis and treatment of diseases of the foot; *Klein v. Sobol*, 167 A.D.2d 625, 562 N.Y.S.2d 856, 860 (3d Dep't 1990)) (treatment of leg disorders beyond scope of podiatrist's practice). Because Dr. Coombs lacked the qualifications to opine on plaintiff's capacity to sit or lift, it is clear that, to the extent that his non-medical opinion purported to discuss plaintiff's limitations other than as caused by the condition of her feet, his opinion should have been accorded little weight. Dr. Coombs was simply not qualified to opine that plaintiff could sit or lift without limitation, yet there is no indication that the ALJ took this into account.

■ Last, but surely not least, the plain language of Dr. Coombs' report does not support the conclusion reached by the ALJ. The ALJ relied on Dr. Coombs' opinion for the proposition that plaintiff was capable of standing for up to two hours in an eight hour workday. Yet Dr. Coombs explicitly noted in his RFC assessment that plaintiff could stand *less* than two hours per day, Tr. 112, and further described plaintiff as being unable "to stand or walk for any length of time." Tr. 104. Dr. Coombs' observations are consistent with plaintiff's testimony that she could stand only for ten minutes, Tr. 35, and inconsistent with the AL's conclusion.

■ The medical evidence submitted by Drs. Parikh and Broomfield similarly does not provide substantial evidence of plaintiff's ability to perform sedentary work. As noted above, although Dr. Parikh apparently completed a residual functional capacity questionnaire submitted to him by the New York State Department of Social Services, Office of Disability Determinations, most of that document is missing from the administrative record, including the pages that related to plaintiff's capacity to lift, carry, stand, walk, sit, push, and pull. Moreover, the assessment form, which is neither signed nor dated, apparently deals with plaintiff's physical condition only through October 26, 1994, more than two years prior to the date the ALJ rendered his decision in February 1996. The

most that reasonably could be discerned from the questionnaire is that, as of October 1994, plaintiff suffered from occasional pain in the right upper quadrant, most severe at times of stress. Dr. Parikh's responses shed no light on plaintiff's ability to lift, carry, stand, walk, sit, push, and pull, either in October 1994 or February 1996.

In further support of the proposition that plaintiff was capable of sedentary work, the ALJ relied upon Dr. Parikh's March 28, 1995 reply to the form letter sent by Pilgrim State, plaintiff's employer, regarding plaintiff's ability to return to full duty. Referring to the letter, the ALJ wrote that "[o]n March 28, 1995, [Dr. Parikh] stated that abdominal pain on exertion restricted the claimant's lifting and bending, but also suggested she try light duty work." Tr. 18. However, read in its entirety, Dr. Parikh's letter advised Pilgrim State that, although plaintiff might be able to return to light duty, she might also experience "severe pain which will mean complete disability." Tr. 137. The letter did not otherwise comment on any of the RFC elements. Tr. 137. Dr. Parikh's letter, fairly read, provides no support for the conclusion that plaintiff was capable of sedentary work. It merely suggests that a trial period of light duty work be undertaken to determine the extent of plaintiff's ability to work.

As for Dr. Broomfield, none of his medical records discuss any of the RFC elements and it is wholly unclear how the ALJ could have concluded from Dr. Broomfield's records that plaintiff could perform sedentary work. At most, Dr. Broomfield's records suggest that, as of his last consultation on October 12, 1994, plaintiff was suffering little abdominal pain. Taken as a whole, the medical opinions of Drs. Parikh and Broomfield, and the non-medical opinion of Dr. Coombs do not provide substantial evidence that plaintiff retained the capacity to perform sedentary work.[5] Indeed, there was a virtual absence of evidence before the ALJ as to plaintiff's capacity to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, all of

which are pertinent to determining plaintiff's RFC.

■ Nor does the new evidence submitted to the Appeals Council provide substantial evidence to support the ALJ's decision as to plaintiff's RFC. Dr. Parikh's brief letter of February 6, 1996 added only that plaintiff had suffered a major attack of pancreatitis in December 1995; otherwise, it merely repeated information already in the record.

Dr. Hamburger's report touched upon plaintiff's ability to lift, but was otherwise silent as to the remaining RFC elements. Dr. Hamburger did suggest that, as of plaintiff's followup visit to him on November 14, 1995, her spondyloarthritis and osteoarthritis were stable at a sedentary level. Tr. 149. His report, however, noted that he had again seen plaintiff on February 15, 1996, at which time additional testing revealed that plaintiff had a marked reduction in range of motion and strength in her ankles with significant although lesser reduction in the hips and in the knees. Dr. Hamburger further observed that, because of the marked reduction in functional capacity of the hips, knees and ankles, plaintiff's capacity to use her lower extremities in any kind of gainful employment was markedly compromised. Dr. Hamburger concluded that plaintiff was disabled because of her lumbar spine osteoarthritis as well as her spondyloarthritis. Tr. 149. It is unclear whether Dr. Hamburger continued to evaluate plaintiff's work capacity as "sedentary" after the February examination. It is equally unclear what he meant by the term "sedentary,." inasmuch as he discussed none of the RFC elements other than lifting and ultimately concluded that plaintiff is disabled. Read in its entirety, Dr. Hamburger's report does not support the Commissioner's conclusion that plaintiff retains the capacity for sedentary work as that term is defined in the regulations.

■ The Commissioner argues that the comments of Dr. Parikh and Dr. Hamburger are consistent with the ALJ's finding that plaintiff is capable of performing sedentary

5. The ALJ's opinion does not expressly discuss the report of Dr. Kousourou's consultative physical examination, which, as discussed *supra*, fails to include any statement regarding any of the

RFC elements and, even when considered in conjunction with the reports discussed above, provides no evidence to support the ALJ's conclusion regarding plaintiff's RFC.

work. Commissioner's Motion at 25. However, the burden of proof is on the Commissioner to offer positive evidence that plaintiff can perform sedentary work, and the burden is not carried merely by pointing to evidence that is consistent with his otherwise unsupported assertion. *See Gray*, 903 F.Supp. at 300 (Commissioner did not meet burden by pointing to reports that merely indicated "a lack of definitive evidence that the plaintiff cannot perform sedentary work"). As the court stated in *Davis v. Shalala*, 883 F.Supp. 828 (E.D.N.Y.1995), in words directly applicable here:

> The error in this case ... is that [plaintiff] was placed in the sedentary category of work capability without any substantial evidence to support his capability to work at this level of physical work demand. Indeed, the ALJ's conclusion was not based on a positive finding that [plaintiff] could perform sedentary work. Rather, it was based on a negative finding that nothing in the record militated against the conclusion that Davis could perform such work. This Court disagrees with that conclusion.

*Id.* at 837. Taken as a whole, the record lacks specific medical evidence that plaintiff can meet the exertional limitations of sedentary work, and the Commissioner has failed to sustain his burden of proof as to the issue of plaintiff's ability to engage in gainful employment.

■ The record's virtual absence of medical evidence pertinent to the issue of plaintiff's RFC reflects the Commissioner's failure to develop the record, despite his obligation to develop a complete medical history. As the Second Circuit has repeatedly observed, the essentially non-adversarial nature of a disability benefits proceeding requires the Commissioner to affirmatively develop the medical record before rendering a final decision. *Pratts*, 94 F.3d at 37; *Perez*, 77 F.3d at 47; *Echevarria v. Secretary of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982). This duty exists even when, as here, the claimant is represented by counsel. *Perez*, 77 F.3d at 47.

The Social Security Act, the regulations issued by the Commissioner, and the Commissioner's interpretation of both, make plain the importance accorded to developing the claimant's medical record. The Act expressly provides that the Commissioner, before making a determination of disability, is responsible for developing a complete medical history of the claimant and for making every reasonable effort to obtain medical evidence from claimant's treating physicians. 42 U.S.C. § 423(d)(5)(B). The regulations amplify the statute's directive in further stating: "Before we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d). The regulations add that "When the evidence we receive from your treating physician ... or other medical source is inadequate for us to determine whether you are disabled ... [w]e will first recontact your treating physician ... or other medical source to determine whether the additional information we need is readily available." 20 C.F.R. § 404.1512(e). In particular, where the adjudicator is called upon to make a determination of a claimant's residual functional capacity ("RFC") to perform gainful employment, he "must ... make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96–8P, 1996 WL 374184, at *5 (1996).

■ Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order. *Pratts*, 94 F.3d at 39; *Parker*, 626 F.2d at 235. Remand is particularly appropriate where the reviewing court is unable to fathom the Commissioner's rationale in relation to the evidence in the record without further findings or explanation for the decision. *Id.*; *Berry*, 675 F.2d at 469. This is such a case. Prior to the January 5, 1996 hearing, the ALJ should have secured a complete and current RFC assessment from plaintiff's treating physicians, Dr. Parikh and Dr. Broomfield, as well as from Dr. Kousourou who, as noted, did not report any findings regarding plaintiff's RFC, in contravention of the regulations. More importantly, however, the ALJ should not have rendered his deci-

sion on February 29, 1996, without securing Dr. Hamburger's medical records. As the ALJ was made aware at the hearing, Dr. Hamburger had already examined plaintiff and was scheduled to examine her again sometime in February. Tr. 37. An ALJ is vested with the power to subpoena the production of medical records relating to a matter under his consideration. 42 U.S.C. § 405(d); *Carroll v. Secretary of Dep't of Health & Human Servs.*, 872 F.Supp. 1200, 1204 (E.D.N.Y.1995). The Commissioner's regulations call for the development of a claimant's complete medical history, 20 C.F.R. § 404.1512(d) and further state that SSA will recontact a claimant's medical sources to secure additional information. Given the state of the medical record at the time of the hearing—one that scarcely spoke to the issue of plaintiff's RFC, and failed to provide probative information regarding plaintiff's claims of arthritis—the ALJ erred in issuing his opinion without securing Dr. Hamburger's records.

Additionally, during the hearing, the ALJ missed the opportunity to develop aspects of plaintiff's disability that were inadequately covered by the then-available medical records. Plaintiff stated in her application that, in addition to suffering from bursitis of the foot, she also suffered from arthritis of the legs, arms, and hands. An X-ray report in Dr. Kousourou's records indicated that plaintiff had some degree of osteoarthritis in her hand. The ALJ did not ask plaintiff if she still claimed to suffer from these ailments and what medical treatment, if any, she had received. In light of Dr. Hamburger's report that, based on an examination some five months before the hearing, plaintiff suffered from degenerative arthritis, degenerative disc disease, and exhibited weakness in both hands, it appears that the ALJ missed a fruitful area of inquiry. Had the ALJ questioned plaintiff with respect to her claim of arthritis of the hands, he might have learned of Dr. Hamburger's finding and concluded that additional development was necessary to determine whether plaintiff suffered from a nonexertional manipulative limitation that significantly diminished her capacity to perform sedentary work.

■ It is surprising that the Appeals Council declined to review the ALJ's decision, particularly in light of the new evidence before it that substantiated plaintiff's arthritis claims—claims that were virtually undocumented in the record at the time the ALJ made his decision. Inasmuch as the Commissioner must consider the limiting effects of a claimant's disabilities in combination, it should have been clear to the Appeals Council that the ALJ's determination was incomplete. Moreover, Dr. Hamburger's observation that plaintiff had a marked weakness in her right hand and some weakness in her left required the Appeals Council to determine whether these conditions impaired plaintiff's ability to manipulate objects and, if so, whether they rose to the level of a nonexertional impairment that significantly reduced plaintiff's ability to perform sedentary work within the national economy.

■ The Appeals Council's terse denial of plaintiff's request for review omitted any explanation for its finding that plaintiff's additional evidence did not provide a basis for changing the ALJ's decision. Tr. 3. This Court need not accept the decision of the Commissioner where he has failed to consider explicitly evidence necessary to a fair determination of plaintiff's application for disability benefits. *Parker*, 626 F.2d at 231; *Smith v. Bowen*, 687 F.Supp. 902, 904 (S.D.N.Y.1988) (Commissioner's failure to explain implicit rejection of relevant evidence is plain error); *Quinones v. Secretary of Dep't of Health and Human Servs.*, 567 F.Supp. 188, 190 (E.D.N.Y.1983) (Appeals Council commits error when it fails to provide its reasons for discounting evidence in form of uncontroverted testimony of treating physician).

## CONCLUSION

The decision of the Commissioner denying disability benefits to plaintiff was based on an erroneous legal standard because the non-medical opinion of Dr. Coombs was treated as a medical opinion. Notwithstanding this error, the decision was otherwise not supported by substantial evidence, and requires remand for further development of the medical record regarding plaintiff's

RFC, including the issue of plaintiff's nonexertional limitations, if any. Accordingly, the Commissioner's motion is denied, plaintiff's cross-motion is granted insofar as it seeks a remand to the Commissioner, and this case is remanded to the Commissioner for further proceedings consistent with this opinion. The Clerk of the Court is directed to close the case.

SO ORDERED.