DECISION
James Boutin ("Boutin" or "appellant") appeals from a decision of a Hearing Officer of the Rhode Island Department of Human Services ("DHS"), denying his application for medical assistance. The appellant argues that the Hearing Officer erred by failing to allocate the appropriate weight to his treating physicians' opinions and by applying the incorrect legal standard in determining that he could perform sedentary work. In opposition, DHS maintains that the Hearing Officer's decision is supported by the evidence and was made upon proper application of the law. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 Facts and Travel
The appellant is a forty year-old man who worked as a truck driver for over twenty years until he was forced to retire as a result of heart problems in August 2004. Prior to his retirement, in November 2002, Boutin was hospitalized after presenting to the emergency room with chest discomfort. (Dr. Katz's notes, Nov. 10, 2002.) At that time, the appellant underwent an urgent left heart catheterization and was diagnosed with myocardial infarction.[1] As a result, he had two intra-coronary stents placed in his artery.[2] Id. In addition, the doctors noted that the appellant's "right coronary artery was diffusely diseased." Id.
On January 15, 2003, Boutin visited with Dr. Marshall Katz, M.D. (hereinafter "Dr. Katz"), a cardiologist in Norwich, Connecticut, regarding his condition. The appellant complained of general fatigue and that he experienced shortness of breath when engaging in physical activity. (Dr. Katz's notes, Jan. 15, 2003.) He inquired about his ability to return to work and was given "a tentative form to be able to return to work" on February 13, 2003. Id. Dr. Katz noted that Boutin "should be able to return to his truck driving, but he will be restricted with respect to lifting and probably won't be able to lift more than 40-50 pounds for short periods of time." Id. In addition, Dr. Katz prescribed medication and recommended that Boutin continue with cardiac rehabilitation. Id.
In June of 2003, Boutin underwent an angioplasty and had additional stents inserted, this time in the proximal right coronary artery and mid right coronary artery. (Dr. Katz's notes, Sept. 10, 2003.) After a follow-up examination on September 10, 2003, Dr. Katz reported that Boutin "has been winded a little bit when he walks but he is actually improving slowly." Id.
Although the appellant was "not feeling quite back to baseline," the doctor's overall impression at that time was that he was "stable with his coronary artery disease." Id. It was also noted that Boutin's cholesterol was "favorable" and recommended that he continue taking medication — Plavix and asprin — and eating a low fat, low cholesterol diet. Id.
The appellant visited Dr. Katz again on November 12, 2003. The doctor noted that Boutin was "doing fairly well" although over "the last three or four weeks he has noted some increasing exertional fatigue and dyspnea at cardiac rehabilitation in particular."[3] (Dr. Katz's notes, Nov. 12, 2003.) Again, Boutin's condition was described as "stable," but his fatigue and dyspnea were characterized as "atypical." Id. Furthermore, the appellant complained of joint pain which Dr. Katz believed could have been a result of his medication. Id.
On December 24, 2003, Boutin went to the cardiac catheterization laboratory at Yale University for a "left heart study, coronary angiography, and left ventriculography." (Doctor's note, Dec. 30, 2003.) The tests revealed that Boutin's "left ventricular function was somewhat reduced, . . . the right coronary artery . . . with the previously recognized region of aneurysm outside the stent, was unchanged, in fact improved from the time of the August of 2003 study[.]" Id. Additionally, "the proximal-ostial stent showed at most a 20-30% recurrent stenosis, a favorable five-month result which should be durable." Id.
The appellant visited Dr. Katz again on January 14, 2004. Dr. Katz observed that Boutin had "very atypical chest pains that appear to be non ischemic in nature despite a very abnormally exercise echocardiogram in November."[4] (Dr. Katz's notes, Jan. 14, 2004.) The doctor reassured Boutin that "the fact that he [was] not experiencing exertional symptoms . . . bodes well."Id. Three months later, the appellant underwent another cardiac catheterization by his primary care physician, Dr. John A. Foley, M.D., the results of which were normal. (Dr. Foley's surgery note, Apr. 23, 2004.)
Upon visiting Dr. Katz on May 25, 2004, the appellant reported fatigue, dyspnea, occasional lightheadedness, and occasional palpitations. (Dr. Katz's notes, May 25, 2004.) The doctor noted that Boutin's fatigue was "somewhat intermittent" but was limiting his ability to do his job. Id. In addition, Dr. Katz observed that Boutin "has had diminished exercise tolerance objectively by stress testing over the last four or five months . . . [w]here he used to walk nine or ten minutes, he was down to six or seven." Id. At the time, Dr Katz was unclear as to the extent that the appellant's exhaustion was related to his heart disease:
 "His symptoms are in the Class II range and sometimes even worse. There is certainly no evidence of volume overload or heart failure on exam. . . . Finally, it is unclear how much of his symptoms may be anxiety or depression related, as his symptoms are intermittent. I did fill out a form for him to be able to drive and he just has to listen to his own body to determine what he is able to tolerate. Based on his exercise tolerance and recent catheterization, it is not unreasonable to have him drive a truck." Id.
During his next visit, on July 28, 2004, the appellant described the same dyspnea and occasional chest discomfort although his most recent cardiac catheterizations demonstrated no notable recurring disease. (Dr. Katz's notes, July 28, 2004.) Dr. Katz diagnosed Boutin with Class II congestive heart failure and observed that the appellant "certainly does not appear to be severely incapacitated enough to warrant being placed on a transplant list." Id. He further stated that he was "actually surprised that [Boutin] is as symptomatic as he is." Id.
Ultimately, Dr. Katz continued to prescribe the appellant medication, recommended a follow up visit, and referred him to see Dr. Stuart Katz of the Yale School of Medicine Heart Failure and Transplant Cardiology Clinic. Id.
In a letter dated August 11, 2004, briefly summarizing Boutin's condition as of that point, Dr. Katz wrote:
 "Mr. James Boutin has significant coronary artery disease with significant diminished heart function. This places him at a significant disadvantage and is probably 60 to 70% disabled. Emotional distress can also adversely affect his congestive heart failure and coronary artery disease. He is susceptible to angina pains.
 This, indeed, is just a general note regarding his cardiac conditions. I cannot offer any specific advice or opinions regarding any other nonmedical issues, of course."
During that same month, Boutin stopped working as a result of his condition. (Dr. Katz's letter of Jan. 20, 2005.)
On August 13, 2004, Boutin completed a Rhode Island Department of Human Services application for determination of his eligibility for disability benefits. In addition, Dr. Katz filled out a medical questionnaire on behalf of the appellant regarding his request for medical assistance. In the questionnaire, Dr. Katz indicated that Boutin's prognosis was "[p]oor, likely to be indefinite (he has dilated (ischemic) cardiomyopathy)." He also specified that the appellant, in an eight hour workday, could walk for up to one hour; sit intermittently with breaks for two to four hours; stand for one hour; lift up to ten pounds for an hour; and not reach or bend at all. In summation, Dr. Katz stated that Boutin has a "problem with ability to work [without] frequent breaks due to combination of [heart failure] (Class 2/3) and side-effects from meds (fatigue/dizziness) . . . [and] has intermittent palpitations . . . which are distracting."
The appellant was admitted to the hospital on September 24, 2004, with chest pain and paresthesias in his fingertips.[5] Although testing revealed that his condition was normal, the doctor's note from the hospital visit states that Boutin "definitely has coronary artery disease with two myocardial infarctions, status post bypass, and apparently is being evaluated at St. Raphael's together with Dr. Katz for a cardiac implanted device." (Dr.'s notes, Sept. 25, 2004.) During a visit on October 26, 2004, Dr. Katz observed that, since being discharged from the hospital, Boutin "has continued to have mild dyspnea on exertion although it may have slightly progressed. He rarely experiences atypical chest discomfort. . . . He continues to have palpitations which consist of `skipped beats' but no prolonged, rapid palpitations." (Dr. Katz's notes, Oct. 26, 2004.) At that time, Dr. Katz's overall impression was that
 "Mr. James Boutin has compensated heart failure that is subjectively a solid Class II, although his exercise tolerance based on exercise testing is Class I-II. I believe his fatigue generalized and exertionally related are out of proportion to his exertional dyspnea, some of which may be related to his mild moderately reduced left ventricular ejection fraction. There may be a component of deconditioning as well. He has no evidence of volume overload today." Id.
Furthermore, Dr. Katz indicated that he "tried to reassure Mr. Boutin . . . that his heart failure is quite stabilized and that his activity tolerance is actually adequate[.]" Id. Boutin was placed in the heart failure transplant system at Yale New Haven Hospital and referred to an electrophysiology study. Id.
On November 5, 2004, the Rhode Island Department of Human Services informed Boutin that his application for medical assistance had been denied because he was not age sixty-five or older, blind, or disabled. (DHS denial letter dated Nov. 5, 2004.) Shortly thereafter, on November 8, 2004, the appellant responded by exercising his right to request a hearing on the matter. (Request for Hearing form dated Nov. 8, 2004.) Subsequently, the hearing was scheduled for December 28, 2004.
The appellant visited Dr. Katz again on December 9, 2004, and, according to the doctor's notes, Boutin's condition had not significantly changed since his previous appointment in October. Three days later, on December 12, 2004, the appellant was admitted to the hospital because of chest pain. (Dr. Scheiber's notes, Dec. 22, 2004.) A heart attack was ruled out by the treating physicians, tests were performed, and Boutin was released with orders to continue taking his medication. Id. A follow-up exam was performed by Dr. Jon F. Scheiber on December 22, 2004. Dr. Scheiber observed that the appellant has "significant symptoms of heart failure . . . [and] chest pain which is likely due to ongoing myocardial ischemia."[6]
On December 28, 2004, an administrative hearing was held before Laurie DiOrio regarding Boutin's application for medical assistance. Boutin testified that he had been to the hospital two times since he initially submitted his application for medical benefits. In addition, he described the numerous medications he was taking for his condition and their side effects, such as, "joint pain, muscle weakness, [and] soreness[.]" (Hearing Transcript at 6.) Boutin testified that he had gained twenty-eight pounds since July 2004 because of his condition.Id. Furthermore, he informed the hearing officer that he was planning on seeing Dr. Charles Koo for testing and an implantation of a defibrillator. Id. at 10. In describing his heart palpitations, Boutin stated, "[i]t literally takes your breathe away. It makes your blood pressure bottom out. It can make you very light headed, very, very dizzy. It can cause upset stomachs, headaches, heart [sic] flashes, cold sweats." Id.
Boutin also indicated that the palpitations "cost" him four jobs within two years and that, on one occasion, he passed out while driving a truck in a landfill. Id. He stated that he would get tired ascending and descending from the trucks and that the cardiac episode he experienced while driving "scared" him into retirement. Id. at 13. Finally, the appellant testified that it is difficult for him to exercise or even complete household chores because he gets fatigued very easily. Id. at 15. At the close of the hearing, the record was left open until January 31, 2005, for Boutin to submit additional medical records.[7]Id. at 24.
Following the hearing, on January 20, 2005, the appellant visited Dr. Koo for an electrophysiology study. Boutin's diagnostic electrophysiology study revealed "inducible, sustained, monomorphic VT that required a shock." (Dr. Koo's letter dated Jan. 31, 2005.) Thereafter, Dr. Koo performed surgery and successfully implanted a "dual chamber ICD with adequate pacing, sensing and defibrillating function."[8]
(Dr. Koo's notes, Jan. 20, 2005.) Around the same time, Dr. Katz and Dr. Scheiber composed letters summarizing the appellant's condition. Dr. Katz stated that Boutin has been out of work:
 "because of ongoing congestive heart failure symptomatology and evaluation. He has moderate Ischemic dilated cardiomyopathy. He has had multiple episodes of dizziness which makes it very difficult for him to even maneuver a car. . . . Given his significant symptomatology, he has been unable to work and will unlikely be able to do manual labor at any point in the intermediate or long term." (Dr. Katz's letter dated Jan. 20, 2005.)
Dr. Scheiber wrote:
 "Over the past year, Mr. Boutin has had gradual decline in functional capacity due to worsening heart failure symptoms. He has significant side effects from the multiple medications that he takes for his heart condition; side effects including orthostatic hypotension, difficulty concentrating, depression, and general lethargy/fatigue. Mr. Boutin also has significant physical limitations with regard to ability to perform physical activities because of his overall severe heart disfunction and also non-sustained ventricular tachycardia.
 I consider Mr. Boutin disabled and unable to work given his current heart condition and it would be also highly unlikely that he would have any improvement over the next two to five years given current test results." (Dr. Scheiber's letter dated Jan. 17, 2005.)
On April 5, 2005, the hearing officer issued a written decision denying Boutin's application for medical assistance because it was determined that he is not disabled for the purposes of the program. In the decision, the hearing officer highlighted Dr. Katz's note from August 2004 where he opines "that [Boutin's] condition renders him `probably 60-70% disabled' but [then] defers opinion overall on other matters." (DHS Decision at 4.) The hearing officer also discussed the October 2004 visit with Dr. Katz stating, "on this date [Boutin] is categorized as having compensated heart failure (subjectively) class II but with objective evidence of Class I-II." Id. at 5. Furthermore, the hearing officer notes that the records reveal a "suspect component of deconditioning . . . as [Boutin's] reported level of fatigue was somewhat disproportionate." Id. Regarding Dr. Scheiber's opinion — set forth in a letter dated January 17, 2005 — that the appellant is disabled and unable to work, the hearing officer expressed concern because the doctor "had a treating relationship with the appellant since December 2004."
In considering Dr. Koo's letter and the implantation of the appellant's defibrillator, the hearing officer concluded:
 "[t]he record ends at this point with no information on his status post defibrillator implantation. Presumably, this procedure would have effectively moderated any occurrences of ventricular fibrillation and like wise [sic] reduce or eliminate any associated symptoms. If these symptoms remain present this is not demonstrated by the current record. However, in light of the extent of the information present and chronicity of the heart condition it is clear that the appellant has a severe medical impairment." (DHS Decision at 6.)
Despite the determination that the appellant suffers from a severe impairment, the hearing officer found that the "matter does not contain evidence of a medical condition that reaches the level of severity of the [Social Security] listings of Section 4.00 Cardiovascular System." Id.
Ultimately, although the hearing officer concluded that Boutin "cannot continuously engage in his past work" as a truck driver,[9] she was of the opinion that the appellant's condition did not prevent him from performing sedentary work.Id. She reached this conclusion by scrutinizing Boutin's residual functional capacity ("RFC") which determines "his ability to engage in a certain level of physical activity despite his impairment." The decision states:
 "Dr. Katz rendered an RFC noting that the appellant can sit and stand intermittently for 2-4 hours with standing and walking limited to one hour each. This is somewhat contrary to the objective findings noted in this decision and seemingly more restrictive than a functional cardiac class II. It is also contrary to the stress test results where the doctor did also note in December 2004 that the appellant's fatigue was out of proportion to the objective findings so it is likely that this particular RFC is slightly more restrictive than necessary. Further, also in one of his letters, Dr. Katz indicates that the appellant could not perform manual labor. He did not however indicate that he could not perform sedentary activities." Id.
The hearing officer also raised concerns over Dr. Scheiber's opinion and afforded it less weight because he did not have the "benefit of a long-standing relationship with [the] appellant."Id. Boutin's complaints about his difficulty concentrating were discounted because they were "based on self-report[.]" Id. at 7. Finally, pursuant to the Medical Vocational Guidelines, the hearing officer concluded that the appellant could perform sedentary work.[10] In summarizing her opinion, the hearing officer wrote:
 "Based on the evidence of record, objective and subjective it appears that the appellant retains the physical ability to perform sedentary activity. This is consistent with his report of activities and consistent with the medical evidence. Generally an individual in functional class II has no symptoms at rest and can perform activities up to 5-6 mets. Additionally, according to generally accepted guidelines, persons with heart failure can normally engage in sedentary work, however may need to pace work activities throughout the day. Sedentary work by definition involves sitting for a majority of the workday and requires a total of only 2 hours (non consecutively) of standing and or walking. This accounts for all customary breaks and lunch periods." Id.
The appellant filed a timely appeal with the Rhode Island Superior Court on April 22, 2005. On appeal, Boutin argues that the hearing officer erred in finding that he can perform sedentary work by failing to afford Dr. Katz's medical opinion the appropriate weight and by rejecting Dr. Scheiber's opinion. The appellant maintains that the evidence regarding his RFC does not establish his ability to do sedentary work and that the hearing officer's decision is based on a conclusory RFC assessment instead of the required function-by-function analysis. Furthermore, Boutin suggests that the hearing officer erred by interpreting the medical records herself rather than accepting the competent evaluations of the doctors and by excluding his symptoms/side effects from consideration.
In response, DHS asserts that the decision denying the appellant medical benefits should be upheld because it was clearly based on the evidence in the record. Additionally, the agency maintains that a treating physician's assessment is not always determinative unless it is supported by medically acceptable diagnostic tests and is not inconsistent with the other substantial evidence. Lastly, DHS, affording the significant deference given to the findings of an administrative agency, argues that the decision should not be overturned.
 Standard of Review
Superior Court review of an administrative decision is made pursuant to the provisions of G.L. 1956 § 42-35-15(g). Section42-35-15(g) provides the following:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
In reviewing an agency decision, this Court is limited to an examination of the certified record in deciding whether the agency's decision is supported by substantial evidence. Ctr.for Behavioral Health, Rhode Island, Inc. v. Barros,710 A.2d 680, 684 (R.I. 1998) (citations omitted). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance."Newport Shipyard, Inc. v. Rhode Island Commission for HumanRights, 673 A.2d 457, 459 (R.I. 1996). In reviewing an agency decision, a "Superior Court trial justice `shall not substitute [his or her] judgment for that of the agency as to the weight of the evidence on questions of fact.'" Interstate Navigation Co.v. Div. of Pub. Utils. Carriers of R.I., 824 A.2d 1282, 1286
(R.I. 2003) (citing Rocha v. State Pub. Utils. Comm'n,694 A.2d 722, 725 (R.I. 1997) (quoting § 42-35-15(g))). Therefore, only where "factual conclusions of administrative agencies . . . are totally devoid of competent evidentiary support in the record" may the Superior Court reverse. Baker v. Dep't of Employment andTraining Bd. of Review, 637 A.2d 360, 363 (R.I. 1994) (quotingMilardo v. Coastal Res. Mgmt. Council, 434 A.2d 266, 272 (R.I. 1981)). However, the Court is free to conduct de novo review of determinations of law made by the agency. Arnold v. R.I. DOL Training Bd. of Review, 822 A.2d 164, 167 (citing JohnstonAmbulatory Surgical Assocs., Ltd. v. Nolan, 755 A.2d 799, 805
(R.I. 2000)). It is inherent in the power of the Superior Court to order a remand to the administrative agency to "correct deficiencies in the record and thus afford the litigants a meaningful review." Birchwood Realty, Inc. v. Grant,627 A.2d 827, 834 (R.I. 1993) (quoting Lemoine v. Dep't of Mental Health,Retardation, Hospitals, 113 R.I. 285, 290, 320 A.2d 611, 614
(1974)).
 Determining Eligibility for Medical Assistance
Medical assistance benefits are made available under a federally funded program derived from the federal Social Security Act. See 42 U.S.C. § 1396 et. seq. DHS manages the program on a statewide level in Rhode Island pursuant to the guidelines established by the federal government. Id.; Tierney v. Dep'tof Human Services, 793 A.2d 210, 211 (R.I. 2002). Under federal law, "an individual shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3). In determining whether an individual is disabled, DHS is required to analyze the applicant's condition using the five-step sequential evaluation method set forth by the federal regulations. See20 C.F.R. § 416.920. Under the five-step evaluation, the inquiry proceeds as follows:
 1. Is the claimant engaged in substantial gainful activity?
 2. If not, is the impairment severe?
 3. If severe, does it meet or equal an impairment listed in the Supplemental Security Income (SSI) regulations?
 4. If it does not meet or equal SSI regulations, does the impairment prevent the claimant from doing past relevant work?
 5. Considering age, education, work experience and residual functional capacity, does the impairment(s) prevent the claimant from doing other work in the national economy?
See 20 C.F.R. § 416.920(a)(4)(i)-(v); see also Bowen v.Yuckert, 482 U.S. 137, 141-43 (1987). The claimant bears the burden of proof with regard to the first four steps and, once the inquiry reaches step five, the burden shifts to the agency to establish that the claimant can perform work in the national economy other than his or her past relevant employment. SeePope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993). "A negative answer to any question, other than step three, leads to a determination of `not disabled.'" McDaniel v. Bowen,800 F.2d 1026, 1030 (11th Cir. 1986); see also Barnhart v. Thomas,540 U.S. 20, 24 (2003).
In the instant action, the hearing officer determined that the appellant met his burden of proof with regard to the first four steps of the five-step sequential evaluation. The hearing officer found that the appellant was unemployed and that his impairment was severe. Although she did not believe that Boutin's impairment met any of the impairments listed in the SSI regulations, she implied that she was satisfied that his heart condition at least equaled the listed impairments by stating, "[t]here are however functional restrictions." (DHS Decision at 6.) Furthermore, the hearing officer was convinced that the appellant's condition was significantly limiting to the point where he was unable to perform his past relevant work as a truck driver. Despite these findings, Boutin's application for medical assistance was subsequently denied at step-five of the evaluation because it was determined that his heart condition did not prevent him from performing sedentary work.
 The Appellant's Ability to Perform Sedentary Work
The appellant argues that the hearing officer erred as a matter of law in finding that he is capable of performing sedentary work. According to the appellant, he does not have the RFC necessary to engage in sedentary work because, as his medical records indicate, he can only sit for two to four hours rather than the six hours mandated by the regulations. In addition, Boutin asserts that the hearing officer impermissibly substituted her own judgment for the opinions of the doctors and failed to consider all of his symptoms in defining the scope of his RFC. Ultimately, the appellant claims that the DHS decision was based on conclusory reasoning and not on the required function-by-function analysis.
Conversely, DHS states that the hearing officer's decision should be affirmed because her finding was appropriately based on the evidence as a whole. DHS maintains that — the medical assistance form ("MA-63") completed by Dr. Katz in August 2004, the appellant's testimony, and the medical records — all support the conclusion that Boutin's RFC is commensurate with the ability to perform sedentary work.
At step 5 of the sequential evaluation process, the hearing officer must determine whether the claimant can do any work considering his or her age, education, and work experience. This inquiry necessitates a determination of the claimant's RFC because it reveals "the most [one] can still do despite [one's] limitations." 20 C.F.R. §§ 416.945(a)(1), 416.945(a)(5)(ii). The RFC assessment requires a "function by function analysis" and is to be based on all of the evidence in the record, including evidence of additional impairments which are not considered "severe." Id.; 20 C.F.R. § 416.945(a)(2); Social Security Ruling ("SSR") 96-8p. The DHS "bears the burden of demonstrating the claimant's capacity to perform each of the RFC elements . . . and must proffer specific medical evidence in support of such demonstration." Sobolewski v. Apfel, 985 F. Supp. 300, 309-10
(E.D.N.Y. 1997) (citing Gray v. Chater, 903 F. Supp. 293, 300
(N.D.N.Y. 1995); Koseck v. Sec'y of Health and Human Servs.,865 F. Supp. 1000, 1013 (W.D.N.Y. 1994)). The decision that a claimant can return to work "must be based on more than conclusory statements." Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir. 1999).
The issue of a claimant's RFC is not a medical issue regarding the nature and severity of an individual's impairment but, rather, is an administrative finding. SSR 96-5p. The adjudicator must always carefully consider medical opinions in determining a claimant's RFC although such opinions are "never entitled controlling weight or special significance." Id.; see alsoReeves v. Barnhart, 263 F. Supp. 2d 154, 162 (D. Mass. 2003) (citing Arroyo v. Sec'y of Health and Human Servs.,932 F.2d 82, 89 (1st Cir. 1991) (finding ALJ not required to accept conclusions of claimant's treating physicians on ultimate issue of disability)). Such a rule has been fashioned because "[g]iving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the [hearing officer's] statutory responsibility to determine whether an individual is disabled."Id. As a lay person, however, the adjudicator is not qualified to interpret raw medical data in functional terms without medical opinion supporting the determination. Nguyen v. Chater,172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y ofHealth and Human Servs., 76 F.3d 15 (1st Cir. 1996); Perez v.Sec'y of Health and Human Servs., 958 F.2d 445, 446 (1 st Cir. 1991)) (citations omitted).
Depending on the claimant's RFC, he or she will be classified as able to perform either "sedentary" work, "light" work, "medium" work, "heavy" work, "very heavy" work, or no work at all. In order to fit into any one of the various categories, one must be able to perform the full range of work, from an exertional standpoint, in that category. See SSR 83-10.
Sedentary work is defined by 20 C.F.R. § 416.967(a) which states:
 "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."
Additionally, sedentary work is primarily performed in a seated position and entails no "significant stooping." See SSR 83-10. "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." Id. Social Security Ruling 83-10 further defines "occasionally" to mean "occurring from very little up to one-third of the time" and states that "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." Id. A finding of "not disabled" would be appropriate where, technically, because of a particular restriction, a person cannot perform the full range of sedentary work, but the compromise is slight in nature and, therefore, leaves the sedentary occupational basis substantially intact. See SSR 83-12(3)(b); see also 3 Social Security Law and Practice § 43:22 (2003) ("an inability to sit more for [sic] than six hours a day is generally not enough by itself to preclude the performance of sedentary work") (citing Hollis v. Bowen,832 F.2d 865 (5th Cir. 1987).
In the case at hand, it was within the hearing officer's power to afford less weight to Dr. Katz's RFC assessment, based on inconsistencies observed in the record, and to Dr. Scheiber's opinion because of his limited treatment of the appellant. As Social Security Ruling 96-5p explains, the determination of a claimant's RFC is an administrative finding and the adjudicator is not bound by the opinions of treating physicians. The hearing officer's decision that Dr. Katz's RFC assessment was "slightly more restrictive than necessary" was supported by substantial evidence in the record. More specifically, the hearing officer noted Dr. Katz's observation that Boutin's fatigue was out of proportion with the objective findings and one of the appellant's stress tests — where he exercised for nine minutes and achieved a workload of 10 mets — was contrary to the doctor's finding that the appellant was in a functional cardiac class II.
Nevertheless, the hearing officer committed error of law by making conclusory findings regarding the appellant's RFC. As the regulations and case law make clear, at step five of the sequential evaluation process, an adjudicator of medical assistance claims bears the burden of showing that the applicant can perform each of the RFC elements by specific medical evidence. Here, after noting legitimate concerns in the record regarding Boutin's claim that he is "disabled" from working, the hearing officer supported her determination that he can engage in sedentary activity by stating: (1) that the defibrillator implantation "presumably . . . would have effectively moderated any occurrences of ventricular fibrillation and like wise [sic] reduce or eliminate any associated symptoms"; (2) that it appears from the objective and subjective evidence in the record "that the appellant retains the physical ability to perform sedentary activity"; (3) his ability to perform sedentary work "is consistent with his report of activities and consistent with the medical evidence"; (4) "[g]enerally an individual in functional class II has no symptoms at rest and can perform activities of up to 5-6 mets"; and (5) "according to generally accepted guidelines, persons with heart failure can normally engage in sedentary work, however may need to pace work activities throughout the day." This assessment falls far short of an analysis of specific evidence regarding this particular appellant's RFC. The numerous generalizations made by the hearing officer represent exactly what the regulations hope to avoid: determinations not grounded in the evidence of the individual case. See Pfitzner, 169 F.3d at 568 (court remanded case where "the ALJ never specifically articulated [the claimant's] residual functional capacity, rather he described it only in general terms"); Cabral v. Heckler, 604 F. Supp. 831, 835
(N.D.Cal. 1984) (basing "not disabled" finding on only two factors, the type of heart disease and the results of a treadmill exercise test, did not constitute an individual assessment of the claimant's RFC). In addition, although the hearing officer could disregard Dr. Katz's evaluation that Boutin can only sit for two to four hours despite the regulatory requirement of approximately six hours of sitting for sedentary work, she failed to articulate how his impairment was otherwise "slight" in nature and, therefore, still allowed him to engage in such activity. As a result of these deficiencies of record, this Court remands the matter to DHS for further consideration of whether there is specific evidence indicating that the appellant has the RFC to perform sedentary work. See Brown v. Chater, 927 F. Supp. 10,16-17 (D. Mass. 1996) (court remanded case where there was "no medical evidence in the record to support the ALJ's conclusion that [the claimant] could perform the full range of sedentary work"); see also Koseck v. Sec'y of Health and HumanServs., 865 F. Supp. 1000, 1013 (W.D.N.Y. 1994); Donahue v.Massanari, 166 F. Supp. 2d 1143 (E.D. Mich. 2001).
 Conclusion
After a review of the entire record, this Court finds that the DHS failed to meet its burden at step five of the sequential evaluation process by not citing specific medical evidence in support of its conclusion that the appellant can perform sedentary work. Accordingly, the DHS decision is arbitrary and in violation of statutory provisions. Therefore, the matter must be remanded back to DHS for further findings consistent with this decision. The parties shall submit the appropriate judgment for entry.
[1] "Infarction" is a "[s]udden insufficiency of arterial or venous blood supply due to emboli, thrombi, mechanical factors, or pressure that produces a macroscopic area of necrosis[.]"Stedman's Medical Dictionary 894 (27th ed. 2000). A "myocardial infarction" is an infarction "of a segment of the heart muscle, usually as a result of occlusion of a coronary artery," and is "the most common cause of death in the U.S." Id. at 895. "About 800,000 people annually sustain first heart attacks, with a mortality rate of 30%, and 450,000 people sustain recurrent heart attacks, with a mortality rate of 50%." Id.
[2] A "stent" is "[a] thread, rod, catheter, lying within the lumen of tubular structures, used to provide support during or after their anastomosis, or to assure patency of an intact but contracted lumen." Stedman's Medical Dictionary 1696 (27th ed. 2000).
[3] "Dyspnea" is defined as "shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." Stedman's MedicalDictionary 556 (27th ed. 2000).
[4] An "echocardiogram" is the record obtained by using an "ultrasound in the investigation of the heart." Stedman'sMedical Dictionary 563 (27th ed. 2000).
[5] "Parethesias" is an "abnormal sensation, such as of burning, pricking, tickling, or tingling." Stedman's MedicalDictionary 1316 (27th ed. 2000).
[6] "Myocardial ischemia" is defined as "inadequate circulation of blood to the myocardium, usually as a result of coronary artery disease." Stedman's Medical Dictionary 924 (27th ed. 2000).
[7] The January 31, 2005, deadline was later extended to February 22, 2005.
[8] An ICD or implantable cardioverter defibrillator is "a small implantable device that looks similar to a pacemaker. . . . While pacemakers can speed up a slow heart rate, ICDs [are] designed to slow down a fast heart rate. In addition, many ICDs also contain a built-in full-featured pacemaker. The ICD detects arrhythmias (both bradyarrhythmia and tachyarrhythmia) and delivers electrical therapy-pacing pulses or defibrillation therapy as necessary. When not needed, the ICD merely monitors the heart without delivering any electrical energy." St. Jude Medical, ICDs, http://www.sjm.com/resources/learnmoreabout.aspx? section=ImplantableCardioverterDefibrillator System (last visited February 27, 2006).
[9] According to the U.S. Dept. of Labor Dictionary of Occupational Titles, a truck driver is engaged in at least light to medium work. (DHS Decision at 6.)
[10] Section 201.27 of the Medical Vocational Guidelines in appendix 2 of 20 C.F.R. § 404.1569 states that a claimant with an RFC to perform sedentary work, a high school diploma, and previous unskilled work experience, generally is not disabled for the purposes of medical assistance.